STATE of Missouri, Respondent,

v.

Jeffrey FERGUSON, Appellant.

No. SC 78609.

Supreme Court of Missouri,
En Banc.

May 30, 2000.

Rehearing Denied June 27, 2000.

Janet M. Thompson, Asst. Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Catherine Chatman, Asst. Atty. Gen., Jefferson City, for respondent.

LIMBAUGH, J.

This is an appeal of defendant Jeffrey Ferguson's second conviction and death sentence for the 1989 murder of Kelli Hall. The first conviction was overturned because of instructional error. *State v. Ferguson*, 887 S.W.2d 585 (Mo. banc 1994). In this case, like the other, Ferguson was convicted by a jury in the St. Louis County Circuit Court of murder in the first degree, section 565.020, RSMo 1986, and the trial court, following the jury's recommendation, sentenced Ferguson to death. The post-conviction court overruled his Rule 29.15 motion without an evidentiary hearing. Because the death penalty was imposed, this Court has exclusive jurisdiction of the appeals. Mo. CONST. art. V. sec. 3; Order of June 16, 1988. The judgments are affirmed.

## I. FACTS

The facts, which this Court reviews in the light most favorable to the verdict. *State v. Wolfe*, 13 S.W.3d 248, 252 (Mo. banc 2000), are as follows:

On February 9, 1989, at about 9:00 p.m., Melvin Hedrick met Ferguson and a friend, Kenneth Ousley, at Ferguson's home. Ferguson asked Hedrick if he would be interested in buying a .32 caliber pistol. Although Hedrick said that he was not interested, he suggested that they take the pistol with them because they might be able to sell it at a bar. Ferguson and Hedrick then made their way to Brother's Bar in St. Charles, where they stayed for about forty-five minutes to an hour. At the bar, Hedrick began to feel ill, and Ferguson arranged for Ousley to meet them at a Shell service station on 5th Street, near Interstate 70. Between 10:50 and 10:55 p.m., Ferguson and Hedrick made the short trip to the Shell station, where Ousley was waiting in Ferguson's brown and white Blazer. Ferguson put the .32 caliber pistol in his waistband and then walked toward the passenger side of the Blazer as Hedrick left for home.

Seventeen-year-old Kelli Hall, the victim in the case, worked at a Mobil service station across the street from the Shell station where Ousley and Ferguson met. Hall's shift was scheduled to end at 11:00 p.m., and at about that time, one of Hall's co-workers, Tammy Adams, arrived at the Mobil station to relieve her. A few minutes later, Robert Stulce, who knew Hall, drove up to the Mobil station to meet a friend and noticed Hall checking and recording the fuel levels in the four tanks at the front of the station. Stulce also saw a brown and white Blazer, which he later identified as identical to Ferguson's Blazer, pull in front of him and stop in the parking lot near Hall. When Stulce looked again, Hall was facing a white male who was standing between the open passenger door and the body of the Blazer. The man stood very close to Hall and appeared to have one hand in his pocket and the other hand free. Stulce then saw Hall get into the back passenger seat of the vehicle.

In the meantime, Hall's boyfriend, Tim Parres, waited for her in his car, which he had parked behind the station. After waiting for Hall for about half an hour, Parres went inside the station looking for her, but to no avail. He and Tammy Adams then determined that Hall was not at home, but that her purse was still at the station, and at that point they called the police.

Early the next morning, February 10, a street maintenance worker for the City of Chesterfield found a red coat, a blue sweater with a Mobil insignia, a white shirt, an undershirt, a bra, underwear, and tennis shoes two to three feet off Creve Coeur Mill Road. In the pocket of the coat was a red scarf and a Mobil credit card slip form with notations on the back about

the fuel levels of two of the underground tanks.

On that same day, Melvin Hedrick heard on two news reports that a girl had been abducted from a St. Charles gas station and that police were looking for a Blazer like Ferguson's. Hedrick called Ferguson and jokingly asked him if he abducted the girl, whereupon Ferguson became angry and responded: "I wasn't even in St. Charles last night. Don't tell anybody I was in St. Charles last night." Later in the evening Ferguson called Hedrick and told him that he thought they were just "joking around" earlier.

That night, Kenneth Ousley showed his friend Mike Thompson two rings and asked him if he knew where they could exchange the rings for money or cocaine. When Thompson asked where the rings came from, Ousley replied that he and Ferguson "did a job in St. Charles" and that Ferguson had a third ring. The next day, February 11, 1989, Ousley and Thompson sought advice from Alicia Medlock about exchanging the rings for drugs or finding a pawnshop, but she provided no help. On February 12, Ousley told Thompson that Ferguson knew a woman in Jefferson County who dealt in jewelry, and that Ferguson would handle getting rid of the rings. Sometime that day, Ferguson offered to sell the three rings to Brenda Rosener—the Jefferson County woman. When Rosener asked Ferguson if they were "hot," he said that they were "very hot." Rosener refused to buy the rings, but Ferguson left them with her anyway and told her to think it over.

During that time, Hedrick began to think that Ferguson was involved in the crime. On Monday morning, February 13, 1989, Hedrick contacted Glenn Young, a co-worker who was a former FBI agent, and suggested that the FBI investigate Ferguson. Later that day, Ferguson called Hedrick and said that he intended to leave town because things were getting "too hot." Ferguson, accompanied by Ousley, then drove to a friend's auto body shop where he asked to have his Blazer painted black, explaining that people with Blazers were being pulled over by police because of the Hall disappearance and that he wanted to avoid being "hassled." The shop owner, however, was too busy to do the job that day, and Ferguson and Ousley left without making an appointment for some other day.

At about this time, the street maintenance worker realized the significance of the clothes he found on Creve Coeur Mill Road and turned them over to the police. The next day, Tuesday, February 14, Kelli Hall's mother identified the clothing he found as the clothing her daughter wore on the night she disappeared.

Several days later, on February 18, Ferguson called Hedrick and told him that the FBI had searched his house, but had not found anything. He urged Hedrick not to tell anyone that he was in St. Charles at the time of the abduction and suggested that if Hedrick had to say anything at all, he should say they were there at 10:00 p.m., rather than 11:00 p.m.

On February 20, Ferguson went to Brenda Rosener's house to inquire about the rings. Because Rosener was not home, Ferguson asked her housemate, Ed Metcalf, if he knew whether she wanted to buy the rings. Ferguson then said that he was being investigated in connection with Kelli Hall's disappearance, whereupon Metcalf asked him to leave. That night, Metcalf asked Rosener to show him the rings that Ferguson was talking about. Suspecting that the rings were Kelli Hall's, they decided to call Michael Eifert, a relative who was an officer with the St. Ann Police Department. After obtaining the three rings from Metcalf and Rosener, Officer Eifert took them to the St. Charles Police Department, and Hall's mother identified them as her daughter's.

Early on the morning of February 22, Warren Stemme was working on his farm in the Missouri River bottoms. As he walked by a machinery shed, he discovered

Kelli Hall's body, frozen, clothed only in socks, and partially obscured by steel building partitions that had been leaned up against the shed. The partitions could not have been moved by one man alone. According to the trial testimony of the state's forensic pathologist, Kelli Hall died from strangulation with a broad ligature, such as a strip of cloth. The pathologist also testified that it would have taken one to two minutes for Hall to lose consciousness; then two or three more minutes for Hall to die; that multiple red horizontal abrasions on Hall's neck indicated a struggle; and, therefore, that the strangulation process could have taken longer than several minutes.

The day that Hall's body was found, FBI agents and St. Charles police arranged for Melvin Hedrick to wear a body transmitter and meet with Ferguson at a bar. Hedrick asked Ferguson what happened to the gun he had with him the night of the abduction, and Ferguson responded, "Just forget the gun. It's gone. I got rid of it." Hedrick said, "You got rid of it?" Ferguson replied, "Hell, yeah." Hedrick told Ferguson that he suspected his involvement in the abduction, and Ferguson stated he could understand why Hedrick was suspicious. When Hedrick commented that they were near the scene at the time of the abduction, Ferguson insisted that it was later or earlier than that. Hedrick pointed out that he had paid with a credit card at Brother's Bar, so the time that they left would be recorded. Ferguson said, "Well, then you will just have to go with that." Referring to the media attention over the abduction, Ferguson then stated: "they're making a big thing out of this thing and it's just another fucking cunt who lost it."

Ferguson was arrested later that night. After being informed of his rights, both at the time of arrest and again at the police station, he indicated he understood, and he agreed to talk to Detective Michael Harvey. Ferguson admitted being at the Shell station, across from the Mobil station, on the night of the abduction, but he denied any involvement. Detective Harvey then placed the three rings in front of Ferguson and told him that the rings had come from an informant named Eddie who said that Ferguson had sold them to him. Ferguson indicated that he knew that this was Ed Metcalf, but said that Metcalf was lying.

The FBI crime laboratory examined blood, hair, fiber, and DNA evidence collected during the investigation. The serology unit tested blood samples from Kelli Hall, Ferguson, and Kenneth Ousley, and the results showed that Ferguson had blood type A and that he was a secretor, which meant that his blood type could be identified from his semen. Ousley had blood type B, and was a non-secretor. Tests of the vaginal swab and the vaginal wash taken from Hall during the autopsy both identified semen that came from someone with type A blood who was a secretor. Another test identified semen collected from the collar and the inside of Hall's coat also as that of an individual with type A blood who was a secretor. Lab personnel then performed DNA analysis—restriction fragment length polymorphism (RFLP)—by comparing DNA extracted from the semen stain on the collar of Hall's coat with DNA extracted from blood samples obtained from Ferguson, Ousley, and Hall. Based on these tests, Ousley's DNA was not present in the semen stain, but the DNA obtained from Ferguson was a "match."

Lab personnel also examined fibers found on Kelli Hall's sweater and socks, compared them to fibers from the carpeting in Ferguson's Blazer, and found them to be "indistinguishable." They also examined a blonde hair of Caucasian origin found on Ousley's shoe (Ousley is African–American), compared it with a sample of Hall's hair, and determined that the hairs were "indistinguishable." Finally, the pubic hair of an African American was recovered from Hall's socks, and it was "indistinguishable" from Ousley's sample.

On the basis of the foregoing evidence, the jury returned a verdict of guilty of murder in the first degree, and the case proceeded to the penalty phase. To show Ferguson's prior assaults, the state introduced the testimony of Holly Viehland, who lived with Ferguson for two years, during which time Ferguson assaulted her and frequently threatened to kill her. Additionally, there was testimony that Ferguson shot an acquaintance, Mike Thompson, in the shoulder during a dispute involving Viehland.

In mitigation, Ferguson presented testimony of two clinical psychologists who testified that he suffered from persistent recurrent depression and a psychiatric disorder known as substance dependence, for which he never received adequate treatment. Ferguson also presented eight other witnesses who testified to his problems with alcohol and drugs and to his otherwise good character.

At the close of the penalty phase evidence, the jury found the presence of the following six aggravating circumstances beyond a reasonable doubt: 1) that the murder of the victim was outrageously or wantonly vile, horrible or inhuman in that it involved torture and depravity of mind, section 565.032.2(7), RSMo 1994; 2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of Ferguson or others, section 565.032 .2(10), RSMo 1994; 3) that the murder was committed while Ferguson was engaged in the perpetration or was aiding or encouraging another person to perpetrate or attempt to perpetrate a felony of any degree of rape, section 565.032.2(11), RSMo 1994; 4) that the murder was committed while Ferguson was engaged in the perpetration or was aiding or encouraging another person to perpetrate or attempt to perpetrate a felony of any degree of kidnapping, section 565.032.2(11), RSMo 1994; 5) that Ferguson committed the crime of assault against Mike Thompson on or about September 12, 1988 (non-statutory); and 6) that Fer-

guson committed the crime of assault against Holly Utz from late 1987 to late 1988 (nonstatutory). Upon the jury's recommendation, the trial court sentenced Ferguson to death. Ferguson timely filed a *pro se* Rule 29.15 motion, and counsel then filed a 249–page amended motion. On February 25, 1999, the motion court filed its findings of fact, conclusions of law, order and judgment, denying all claims without a hearing and dismissing Ferguson's motion in its entirety with prejudice. This consolidated appeal followed.

## II. ALLEGATIONS OF TRIAL COURT ERROR

### A. Voir Dire

■ Ferguson claims that the trial court improperly restricted death qualification voir dire by refusing to allow him to ask the prospective jurors the following three questions regarding their ability to consider mitigating factors in the penalty phase:

1) Can you imagine any mitigating factors that would make you think that punishment for murder in the first degree should be something other than the death penalty?

2) What kind of factors would you consider in determining the correct punishment?

3) What sort of factors would you take into consideration?

It is well-settled that the nature and extent of questioning on voir dire is within the discretion of the trial judge, and only a manifest abuse of discretion and a probability of prejudice to the defendant will justify reversal. *State v. Armentrout,* 8 S.W.3d 99, 109 (Mo. banc 1999). Missouri courts have held time and again that prohibiting open-ended questions like those asked here is a proper exercise of the trial court's discretion. *See, e.g., State v. Middleton,* 995 S.W.2d 443, 461 (Mo. banc 1999); *State v. Thompson,* 985 S.W.2d 779, 790 (Mo. banc 1999); *State v. Chaney,* 967 S.W.2d 47, 57 (Mo. banc 1998). The open-ended or over-broad questions in this case

have no reference to any pertinent mitigating circumstances, and therefore, the information sought is irrelevant. *See Middleton*, 995 S.W.2d at 461. Furthermore, they are questions that appear to be intended to elicit responses that would be more helpful in forming a strategy for the penalty phase of trial, rather than merely exposing disqualifying bias.

■ Even if the questions regarding mitigation should have been allowed, Ferguson suffered no prejudice. The trial court did not preclude defense counsel from exploring this line of questioning, as long as he changed the form of the questions. In that respect, defense counsel was permitted to ask each prospective juror individually whether he or she would properly consider mitigating circumstances that would justify a life sentence rather than the death penalty.

■ Ferguson also argues the trial court erred in sustaining objections to certain mitigating circumstances questions asked of another prospective juror, Mr. Wilson. However, these questions were potentially confusing, and therefore, improper, because defense counsel had not set the context for the questions by explaining the distinction between the guilt phase and the penalty phase of the trial. *State v. Thompson*, 985 S.W.2d 779, 790 (Mo. banc 1999). Furthermore, Mr. Wilson was stricken for cause, and, for that reason alone, Ferguson cannot now complain that he was unable to expose Mr. Wilson's possible bias.

### B. Guilt Phase

#### 1. Admission of DNA Evidence

■ Ferguson alleges that the trial court erred in admitting DNA evidence. Although Ferguson admits that the RFLP method of DNA testing is generally accepted in the scientific community, he contends that the procedures used by the FBI did not conform with those required by the scientific community. Because Ferguson failed to object to the admission of the DNA evidence, he seeks plain error review under Rule 30.20, which requires a showing of manifest injustice. The admission of the DNA evidence, however, was not erroneous in the first place. This Court reaffirms its holding in *State v. Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991), *cert. denied*, 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992), that the "argument concerning the manner in which the [DNA] tests were conducted goes more to the credibility of the witness and the weight of the evidence . . ."—not to admissibility. *See also State v. Huchting*, 927 S.W.2d 411, 417 (Mo.App.1996); *State v. Davis*, 860 S.W.2d 369, 374 (Mo.App.1993). Ferguson's remedy is not to exclude the evidence, but to cross-examine the state's experts and to call expert witnesses of his own. The point is denied.

■ Next, Ferguson claims that the trial court erred in admitting the DNA evidence because the state presented no evidence of the statistical significance of its DNA test results, and the characterization of the DNA comparison as a "match" is meaningless. This theory was not presented to the trial court, and like the previous claim, is only reviewable for plain error resulting in manifest injustice. Rule 30.20. Scientific evidence, such as hair, fiber, and blood type evidence, is often admitted where the only conclusion to be drawn is that the tested sample is consistent with the defendant's sample, or that defendant's sample shows that he cannot be excluded as the perpetrator. Therefore, it was not error, much less manifest injustice, to admit the testimony that Ferguson's DNA "matched" that of the DNA extracted from the semen stain on Hall's coat.

It bears mention that the absence of manifest injustice is also shown by the fact that Ferguson had good reason to avoid any inquiry about the statistical significance of the "match." At Ferguson's first trial, the state's DNA expert testified that the chances that the semen stain was from someone other than Ferguson were 1 in

1.7 million or 1 in 11 million, depending on the statistical approach used. Although admission of that statistical evidence was hotly contested, this Court did not reach the issue in the first appeal, and therefore, neither Ferguson nor the state could be assured of a favorable ruling before this Court the second time around. To avoid the risk that the state would successfully introduce the more damaging statistical evidence, Ferguson was justified, as a matter of trial strategy, in declining to object to the less damaging characterization that the evidence was a "match."

■ Finally, Ferguson contends that the DNA evidence should not have been admitted because the semen sample was consumed in the FBI's tests, and he was not able to have it independently tested. In cases where the testing agency finds it necessary to consume the only sample of evidence in the testing procedure, admission of the test results does not violate due process in the absence of bad faith on the part of the state. *Arizona v. Youngblood,* 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Because Ferguson has failed to allege that the semen sample was consumed in bad faith, this claim fails as well.

### 2. Admission of hearsay statements

■ Ferguson alleges that the trial court erred in admitting hearsay evidence of Ousley's statements relating to the attempted disposition of Kelli Hall's rings. These statements, as noted, were admitted through the testimony of Alicia Medlock and Mike Thompson. Thompson testified that on the day of the abduction Ousley showed him two of the rings, explained that he and Ferguson "did a job in St. Charles," and asked if he knew where to get money or drugs for the rings. Alicia Medlock testified that within two days of the abduction, Ousley and Thompson came to see her, and Ousley asked her if she knew of a pawnshop or a place where he might exchange the rings for drugs. The next day, Ousley told Thompson that Fer-guson knew a woman that would take the rings.

■ Statements of one conspirator are admissible against another under the co-conspirator exception to the hearsay rule, even if a conspiracy has not been charged. *State v. Pizzella,* 723 S.W.2d 384, 388 (Mo. banc 1987). For a statement to be admissible under the co-conspirator exception, there must be a showing, by evidence independent of the statement, of the existence of the conspiracy, and in addition, the statement must have been made in furtherance of the conspiracy. *Id.* The existence of a conspiracy need not be shown by conclusive evidence and may be established, instead, by circumstantial evidence consisting of the mere appearance of "acting in concert." *State v. Clay,* 975 S.W.2d 121, 131 (Mo. banc 1998), *cert. denied,* 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999).

In this case, there was sufficient evidence that Ferguson and Ousley were acting in concert in committing the crime. The evidence placed both of them in Ferguson's Blazer at the scene of the abduction. In addition, both were linked to the crime through laboratory analysis: pubic hair found on Hall's body was consistent with Ousley's pubic hair and hair found on Ousley's shoes was consistent with Hall's hair; the DNA profile from the semen found on Hall's coat matched Ferguson's DNA profile. Also, both men had possession of one or more of Hall's rings at one time or another after the abduction.

■ Ferguson argues, however, that Ousley's statements were not made "in furtherance of the conspiracy" because the criminal enterprise had ended. If, however, the conspiracy continues for any purpose, such as concealing the crime, the declarations of one co-conspirator are still admissible against the other. *State v. Isa,* 850 S.W.2d 876, 892 (Mo. banc 1993). Here, Ferguson and Ousley continued to act together to eliminate evidence of their crime by selling the rings. That their

main objective was to dispose of incriminating evidence is demonstrated by the fact that Ferguson finally left the rings with Brenda Rosener, even though she had not agreed to buy them. Under these circumstances, the statements were properly admitted. Even if admission of the statements had been error, Ferguson could not have been prejudiced because the jury learned independently of his own attempts to sell the rings through the testimony of Brenda Rosener and Ed Metcalf.

### 3. Sufficiency of Evidence

▆ Ferguson next contends that there was insufficient evidence to establish that he deliberated before the murder. He was tried on a theory of accomplice liability. To convict him of murder in the first degree, the jury had to find that he or Kenneth Ousley knowingly caused the death of Kelli Hall after deliberation on the matter. Section 565.020, RSMo 1986. Ferguson need not have personally performed each act constituting the elements of the crime, *State v. Clay*, 975 S.W.2d 121, 139 (Mo. banc 1998), *cert. denied*, 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999), but in order to be responsible for Ousley's acts, he must have acted together with or aided Ousley either before or during the commission of the crime, with the purpose of promoting the crime. Section 562.041.1(2), RSMo 1986. In addition, where a defendant is convicted of first degree murder as an accomplice, the state must prove that the defendant personally deliberated upon the murder. *State v. Rousan*, 961 S.W.2d 831, 841 (Mo. banc), *cert. denied*, 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). Deliberation is "cool reflection upon the matter for any length of time, no matter how brief." Section 565.002(3), RSMo 1994. Like any state of mind, deliberation generally must be proved through the surrounding circumstances of the crime. *State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997), *cert. denied*, 522 U.S. 1150, 118 S.Ct. 1171, 140 L.Ed.2d 181 (1998).

▆ Ferguson's more specific claim is that the only evidence of deliberation is the manner in which Hall was killed and that that particular evidence does not indicate Ferguson's personal deliberation. Ferguson explains that an inference of personal deliberation derived from the manner in which the victim was killed is only appropriate where the defendant personally caused the victim's death, *State v. O'Brien*, 857 S.W.2d 212, 219 (Mo. banc 1993), and in this case, Ferguson's direct participation in the murder was not established. This Court disagrees. The record shows that a white male in a Blazer, identified as Ferguson's, was seen talking to Hall immediately before she was abducted. The DNA in a semen stain found on Hall's coat matched Ferguson's DNA. The body was partially covered by steel partitions that Ousley, alone, could not have moved. A reasonable juror could infer from this evidence that Ferguson intended to abduct, rape, and rob the victim, and to murder her so that there would be no witness. In fact, the evidence indicated that Ferguson was the principal actor. Ferguson possessed a gun, and he appears to be the one who first accosted Hall. The evidence that Ferguson raped her was overwhelming. Further, Ferguson generally appeared to exercise a significant degree of control over Ousley. Although Ousley was often in Ferguson's company, Ferguson treated him poorly, referred to him as "his nigger," and regularly required him to wait outside rather than go with Ferguson into public places. On this record, the evidence was sufficient to submit the charge of murder in the first degree to the jury.

### 4. Instructions

Ferguson argues that the trial court plainly erred in submitting Instruction 5, the verdict director for first-degree murder, which was based on MAI–CR3d 304.04 and MAI–CR3d 313.02. This instruction, Ferguson claims, misled the jury by allowing a finding of guilt against him

even if the evidence showed that only Ousley had deliberated. Ferguson failed to properly object to this instruction and is only entitled to plain error review on a showing of manifest injustice. Rule 30.20. As this Court has repeatedly held, the alleged deficiency in the verdict director is not error, plain or otherwise, *State v. Copeland*, 928 S.W.2d 828, 848 (Mo. banc 1996), *cert. denied*, 519 U.S. 1126, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997); *State v. Richardson*, 923 S.W.2d 301, 318 (Mo. banc), *cert. denied*, 519 U.S. 972, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996), and an extended discussion on the point would have no precedential value. The point is denied.

### 5. Closing Argument

Ferguson contends the prosecutor made ten different comments in guilt phase closing argument that constitute reversible error. However, he made an objection to only one of the ten. The only point preserved involved the prosecutor's discussion of the testimony of Ferguson's expert witness, Dr. Libby. The prosecutor, while reminding the jury of questions that he asked that witness, stated, "And I said [to Dr. Libby], 'Do you remember Dr. Allen with the Chapman Institute of Medical Genetics? He was a defense witness. Did you ever discuss with him that he said all these bands matched?'" Defense counsel then objected that "the witness said that he didn't know what the other witness said," which was to say that the prosecutor was misstating the evidence. The trial court responded that "the jury will recall the evidence as they heard it."

▆▆▆ The trial court has broad discretion in controlling the scope of closing argument, and the court's rulings will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant. *State v. Deck*, 994 S.W.2d 527, 543 (Mo. banc 1999). In this

instance, the trial court did not abuse its discretion in overruling the objection because the prosecutor had not yet commented on Dr. Libby's response to his question, and for that reason, the objection was premature. In fact, the prosecutor never did follow-up and comment on Dr. Libby's response, even after the objection was overruled.

The remaining allegedly improper comments, for which Ferguson asks plain error review under the manifest injustice standard, include: 1) "... if that's not cool deliberation, I don't know what is ...;" 2) "[Brenda Rosener and Ed Metcalf] thought that [Ferguson] was involved in this murder ..." and that "We know that Ed wasn't lying;" 3) "The jury should consider the personal emotional impact on them;" 4) "... that's the way DNA is put on. It's not to the degree of fingerprints, yet." 5) "[Defense witness Gamel] stated [Ferguson] was 'slurring a little bit' [at the bar] and Hedrick stated he 'staggered a little bit;'" 6) "This was a deliberate killing because they tried to sell Hall's rings later;" 7) "A pubic hair on Hall's sock 'matched' Ousley's;" 8) "The same guy that had the rings matches the semen stain on her shoulder. The same guy that had the rings matches the pubic hair on her sock out in that field;" and 9) "[Ferguson] never looked at you and said, 'I didn't kill that girl.'"

Ferguson's laundry list of improprieties regarding these statements include personalizing, bolstering, vouching for witnesses' judgment and credibility, misstating the evidence, and infringing on the right against self-incrimination. On review of the record, each of the prosecutor's comments either have been taken out of context or otherwise mischaracterized, and none of the remarks constitutes error, much less manifest injustice.[1]

---

1. It is a concern of this Court that the public defender's office presses these claims even though the post-conviction motion court concluded, and this Court agrees, that most are

frivolous. Some are even sanctionable. For example, Ferguson's entire discussion regarding the comment that "[T]he jury should consider the personal emotional impact on

### C. Penalty Phase

#### 1. Denial of Request for Adjournment

 Ferguson claims that the trial court erred in denying his request to adjourn after the guilt phase verdict was returned at 5:10 p.m. on October 23, 1995, and in proceeding with the penalty phase case until 10:00 or 10:30 that night. He also claims the trial court erred in denying his subsequent motion for mistrial, which was based on the same grounds. In determining whether to grant a recess or temporary adjournment during a trial, the trial court has considerable discretion and will not be found to have abused its discretion in the absence of a very strong showing of prejudice. *State v. Middleton*, 995 S.W.2d 443, 464–65 (Mo. banc 1999). Here, Ferguson contends that the members of the jury, having had a full day in court, were too tired and aggravated to be attentive during the evening session, and further, that trial counsel was too tired to proceed and was unprepared to present the testimony of Ferguson's two penalty phase expert witnesses.

These charges, however, are refuted by the record. About 10:30 p.m., the trial court informed the jury that it was going to save final argument for the next morning, and later made a record that the jurors were disappointed because they wanted to finish the case that night, which indicates, at the least, that the jurors were not too tired or aggravated to listen to evidence up to that time. The trial court's determination is also supported by the fact that the jurors were sequestered and could not return home, which explains why they were able and willing to proceed beyond the usual working hours. In addition, trial counsel made no mention in her request for adjournment or in the motion for mistrial that she, herself, was too tired to proceed or unprepared to proceed, and her focus was solely on her perceived adverse effect on the jurors. Even if counsel had based the motion on her own fatigue and lack of preparation, there was no prejudice. The record shows that counsel was able to elicit a wealth of testimony in mitigation from the two experts, both psychologists, that included the results of extensive psychological testing and the diagnoses that Ferguson suffered from depression and substance dependence. Their testimony supported, in particular, the statutory mitigating circumstance that Ferguson's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." The claim has no merit.

#### 2. Evidence of unadjudicated bad acts

 Ferguson contends that the trial court plainly erred in allowing the state to present evidence of unadjudicated bad acts through the testimony of penalty phase witnesses Holly Viehland and Mike Thompson without giving notice of the evidence prior to trial. Because Ferguson did not object to this evidence, he must show plain error under the manifest injustice standard. Rule 30.20. Contrary to Ferguson's contention, he was clearly on notice that the state would call Viehland and Thompson because the state called them as witnesses during the penalty phase at Ferguson's first trial. Although extensive evidence of a serious unconvicted crime is inadmissible in the penalty phase if the state provides no timely notice that it intends to introduce the evidence, it is not plain error to introduce the evidence if it was introduced at an earlier trial. *State v. Chambers*, 891 S.W.2d 93, 107 (Mo. banc 1994).

 Ferguson also briefly alleges that the state failed to comply with section 565.005, RSMo 1994, by failing to provide notice of all the statutory aggravators that it intended to prove and the witnesses it

them"—a serious charge which, if true, may well constitute reversible error—amounted to only one clause in the point relied on and one

sentence in the argument and was supported solely by a citation to the transcript that was totally irrelevant.

intended to call in the penalty phase. This claim, however, is not in the Point Relied On in his brief, and, therefore, it is not preserved for appellate review. In any event, Ferguson cannot claim that he was prejudiced because all of the statutory aggavators submitted to the jury in the second trial were disclosed prior to the first trial.

Additionally, Ferguson claims in his point relied on that the admission of unadjudicated bad acts in the penalty phase (other than the two assaults that were specifically instructed on) violates due process because the state is not required to prove those acts beyond a reasonable doubt. Ferguson offers no argument in support of the claim, probably because it has been repeatedly rejected by this Court. *State v. Kinder*, 942 S.W.2d 313, 331 (Mo. banc 1996), *cert. denied*, 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). The point is denied.

### 3. Instructions

Ferguson next challenges the submission of Instructions 16 and 17, the instructions for statutory and nonstatutory aggravating circumstances, respectively.

The first of Ferguson's several reasons why the trial court erred in submitting Instruction 16 is that the portion of the instruction dealing with the first statutory aggravating circumstance is unconstitutionally "vague and overbroad, applicable to any murder and thus not narrowing the class of individuals to whom the death penalty applies...." The instruction states:

1. Whether the murder of Kelli Hall involved torture and depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

[1] That the defendant's selection of the person he killed was random and without regard to the victim's identity and that defendant's killing of

Kelli Hall thereby exhibited a callous disregard for the sanctity of all human life.

 Ferguson specifically challenges the limiting language of subsection [1] regarding the random selection of the victim, the purpose of which is to comply with *State v. Griffin*, 756 S.W.2d 475, 490 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). In *Griffin*, this Court held that, in order to avoid an arbitrary application of the death penalty, the depravity of mind aggravator must be supplemented by a finding of at least one of a number of court-approved limiting factors. In *State v. Brooks*, 960 S.W.2d 479, 496 (Mo. banc 1997), *cert. denied*, 524 U.S. 957, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998), this Court held that the random selection of the victim is to be included in this list of limiting factors. Nonetheless, Ferguson claims that subparagraph [1] "does not limit the class eligible for death or guide discretion," because "a murder victim is always either someone unknown to the defendant, as here, or known to the defendant...." This Court is at a loss to understand this argument. The fact that Ferguson's selection of his victim was random demonstrates a callous disregard for the sanctity of all human life. Therefore, requiring the jury to find that Kelli Hall was chosen at random sufficiently "narrows the depravity of mind aggravating circumstance to those murders that involve an absence of any substantive motive." *Brooks*, 960 S.W.2d at 496.

 Ferguson also argues that the randomness provision of subsection [1] violates section 565.032.1(2), RSMo 1994, which provides that the jury "shall not be instructed upon any specific evidence which may be in aggravation or mitigation of punishment...." However, Ferguson did not specify this reason to the trial court when he objected to Instruction 16 during the instruction conference, as required under Rule 28.03. As a result, Ferguson is only entitled to plain error

review under Rule 30.20 and must establish that the trial judge so misdirected or failed to instruct the jury as to cause manifest injustice. *State v. Doolittle*, 896 S.W.2d 27, 29 (Mo. banc 1995). Despite the statutory prohibition that jurors should not be instructed on specific evidence of aggravation or mitigation, the randomness provision serves to limit and thereby constitutionalize the depravity of mind aggravator. For that reason, no manifest injustice occurred.

 Although Ferguson contends that there was no evidence to support the submission of the second aggravating circumstance—"[w]hether the murder of Kelli Hall was committed for the purpose of avoiding or preventing a lawful arrest of the defendant or Kenneth Ousley"—he couches his argument like that regarding the first aggravator—that the instruction does not sufficiently narrow the field of those eligible for the death penalty. There is no narrowing of the field, as Ferguson claims, because every murder can be said to have been committed, at least in part, to avoid or prevent the arrest of the perpetrator of the murder. This argument fails because it ignores the logical inference that Kelli Hall was killed to avoid Ferguson's and Ousley's arrest for kidnapping and rape.

 Ferguson also challenges the submission of the third and fifth aggravating circumstances instructions (no finding was made on fourth aggravator), which state:

3. Whether the murder of Kelli Hall was committed while the defendant was engaged in the perpetration of or the attempt to perpetrate or was aiding or encouraging another to perpetrate or the attempt to perpetrate a felony of any degree of rape.

\* \* \* \* \* \*

5. Whether the murder of Kelli Hall was committed while the defendant was engaged in the perpetration of or the attempt to perpetrate or was aiding or encouraging another to perpetrate or

the attempt to perpetrate a felony of any degree of kidnapping.

Ferguson relies on *State v. Isa*, 850 S.W.2d 876, 902 (Mo. banc 1993), for the proposition that the phrase "aiding or encouraging another" permitted the jury to sentence him to death for Ousley's actions. This is another claim that has been repeatedly denied. The incorporation of the phrase "aiding or encouraging another," or similar language, "does not remove the jury's focus from the 'convicted murderer's own character, record and individual mindset as betrayed by [his] own conduct.'" *State v. Hutchison*, 957 S.W.2d 757, 765 (Mo. banc 1997); *State v. Gray*, 887 S.W.2d 369, 387 (Mo. banc 1994).

Ferguson's complaint about Instruction 17, the instruction on the two nonstatutory aggravating circumstances, is that it also violates section 565.032.1's prohibition against instructing on specific evidence of aggravators or mitigators. Again, Ferguson failed to specify this reason to the trial court when he objected to the instruction during the instruction conference. The claim is reviewable only under the plain error/manifest injustice standard of Rule 30.20. Ferguson offers no reason to believe that he suffered manifest injustice because of this instruction, and this Court has found none. The point is denied.

### 4. Closing Argument

Ferguson contends that 12 of the prosecutor's statements in the state's penalty phase closing argument constitute reversible error. Only five of these challenges were preserved for appeal.

 First, Ferguson claims that the prosecutor argued facts not in evidence or misstated evidence when he said, "You know what [Hall's] mother felt like then? Like her world had just dropped out." Prosecutors may comment on the evidence and the reasonable inferences to be drawn from the evidence, as long as they do not imply knowledge of facts not before the jury. *State v. Clemons*, 946 S.W.2d 206, 228–29 (Mo. banc), *cert. denied*, 522 U.S.

968, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997). Here, the prosecutor did not improperly speculate, and, instead, merely stated an obvious inference drawn from Kelli Hall's mother's testimony.

▇ Next, Ferguson claims that the prosecutor improperly speculated when he remarked, " . . . we don't know whether he kept that ligature on or whether it was released and she started to come to and he had to go back and do it again. You've seen those marks." The trial court did not err by overruling the objection to these statements, because they were drawn directly from the testimony of the medical examiner.

▇ Ferguson also claims that the prosecutor improperly speculated and misstated the evidence by commenting:

What was going through her mind before she lost consciousness? She knew she was never coming out of that field . . . any begging out there fell and falls on deaf ears.

This comment was not objectionable because it was a reasonable inference from the evidence.

▇ The two remaining comments were challenged on the ground of improper personalization. The prosecutor stated:

. . . no matter how long they had her out there, have you thought during the course of the trial what was going through her mind, how frightened she had to be?

\* \* \* \* \* \*

. . . when you get back there and you start being concerned about Jeff Ferguson and feel sorry for him, think about what it was like out in that field that night.

A prosecutor "may recount in detail the victim's pain and suffering, engendering sympathy in the jury during the penalty-phase closing argument," and such argument is only improper when it suggests a personal danger to the jury or their families. *State v. Rhodes,* 988 S.W.2d 521, 528

(Mo. banc 1999). These comments did not suggest such a personal danger, and therefore, the trial court committed no error in overruling the objections.

▇ Ferguson requests plain error review under the manifest injustice standard for the following seven comments: 1) "She's left out there for 13 days nude. There were marks on her neck. You know that involved torture and depravity of mind;" 2) "He's choking and beating other women;" 3) "I could have brought in Kelli Hall's family. I could have put her mother up on the stand, tell us about her childhood and have her cry. I could have brought her grandparents in . . . . But I am not parading them in here to tell you what a wonderful little girl she was and how much they are going to miss her and that sort of thing;" 4) "You have to protect Kelli Hall. We have to protect every child like her, ladies and gentlemen. Society sometimes has to make tough decisions;" 5) "If any one of you had been out in that field and saw what happened that night, like that you would have known what has to be done in this case;" 6) "And it's time for society to take a stand and take it against the people like Jeff Ferguson who just manipulate and use people;" 7) "So I am asking you on behalf of the State of Missouri, and on behalf of Kelli Hall's family, to return a verdict of death in this case."

▇ Ferguson alleges that these statements are improper because they misstate the law or misstate the facts or they constitute speculation or personalization. Upon review of the record, six of the seven statements have either been mischaracterized or taken out of context and were not erroneous, and like the claims regarding the prosecutor's closing argument in guilt phase, most are frivolous. The prosecutor did, however, make one misstatement of fact when he commented that Ferguson was "choking and beating other women," and Ferguson correctly points out that the state presented evidence that he beat and choked only one woman other than Kelli

Hall. This does not amount to manifest injustice. The point is denied.

## III. ALLEGATIONS OF RULE 29.15 MOTION COURT ERRORS

■■■■ Appellate review of a post-conviction motion is limited to a determination of whether the findings of fact and conclusions of law are "clearly erroneous." *State v. Brown*, 998 S.W.2d 531, 550 (Mo. banc 1999). Findings and conclusions are clearly erroneous if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made. *Id.*

■■■■ As noted, the motion court refused to grant an evidentiary hearing on any of the claims in Ferguson's Rule 29.15 motion. The motion court need not hold an evidentiary hearing unless: 1) the movant cites facts, not conclusions, which if true would entitle the movant to relief; 2) the factual allegations are not refuted by the record; and 3) the matters complained of prejudiced the movant. *State v. Moss*, 10 S.W.3d 508, 511 (Mo. banc 2000).

### A. Disclosure

Several of Ferguson's Rule 29.15 claims arise from the state's alleged failure to disclose exculpatory evidence before and during the trial. Under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), due process requires the state to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). More recently, the Supreme Court has held that there are three components of a *Brady* violation: 1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; 2) the evidence must have been suppressed by the state, either willfully or inadvertently; and 3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

#### 1. The surveillance videotape

■■■■ Ferguson first claims that the motion court clearly erred in denying a new trial or other post-conviction relief on the ground that the state failed to disclose a surveillance videotape that was supposedly made at the Mobil gas station on the night of Kelli Hall's abduction. However, Ferguson failed to properly plead this alleged *Brady* violation in his Rule 29.15 motion, asserting nothing more than that the "state had in its possession material exculpatory evidence that was not turned over to the defense," without specifying what the exculpatory evidence might be. This allegation fails to cite "facts, not conclusions, which if true would entitle the movant to relief." Indeed, Ferguson conceded in the motion, itself, that he had no facts to support the claim of withholding evidence. In *State v. Brooks*, 960 S.W.2d 479, 500 (Mo. banc 1997), *cert. denied*, 524 U.S. 957, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998), this Court has made it clear that claims based on this sort of pleading are unacceptable:

> Appellant contended in his amended motion that the state had in its possession material, exculpatory evidence that the state failed to turn over to the defense. He sought to establish a claim of violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant's claim is patently frivolous. It is entirely speculative and conclusional. There is no authority in law for the proposition that a defendant may simply make a general allegation of a *Brady* violation so as to require the motion court to grant an evidentiary hearing and to order that the state discloses its entire file so that a criminal defendant may cast about, attempting to discover whether or not a *Brady* violation may have occurred. Appellant's claim requires no further discussion.

In a related claim, Ferguson complains that the state violated the motion court's discovery order to allow his counsel to view the surveillance videotape. Discovery in post-conviction relief cases, which are civil in nature, is governed by Rule 56.01, so that Ferguson is entitled to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...." Rule 56.01(b)(1). Despite the motion court's order, the pleading defect in Ferguson's *Brady* claim—the failure to cite facts, not conclusions, that would entitle him to relief—foreclosed any entitlement to discovery on the matter. The *Brady* violation was not actionable from the start and was ultimately dismissed by the motion court for that reason, and therefore, discovery sought pursuant to the *Brady* violation was never "relevant to the subject matter involved in the pending action." To hold otherwise—to allow full-scale discovery on matters not properly pled—expands and distorts the post-conviction relief proceedings, and *Brady*, itself, to something that was never intended.

■ Even if Ferguson had properly pled a *Brady* violation, by the time he made his request for disclosure, which was more than a year after the filing of his amended Rule 29.15 motion, the videotape had been either lost or destroyed. Absent a showing of bad faith on the part of the police or prosecutor, the failure to preserve even potentially useful evidence does not constitute a denial of due process. *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Ferguson has made no such showing, and the record discloses none.

■ Assuming that Ferguson had properly pled the *Brady* claim, that he was entitled to discovery, and that the videotape had been preserved, he still has not established that the evidence was exculpatory or that prejudice resulted. According to Ferguson's theory of the case, Mike Thompson and Kenneth Ousley were the actual perpetrators. Witnesses had seen Kelli Hall talking with a white male and a black male, possibly resembling Thompson and Ousley, who had come to the station in a rusty Blazer between 9 and 10 p.m. on the night of the abduction, and their presence at the gas station would supposedly be borne out by the videotape. However, even if that evidence appeared on the videotape, which is obviously a speculative proposition, it does not in any way negate Ferguson's guilt. Ferguson admitted he was with Ousley in the vicinity of the Mobil station at about 11 p.m. when the abduction occurred, and therefore, he was still fully capable of participating in the crimes. Even under Ferguson's best case scenario, there is no reasonable probability that the result of the trial would have been different.

## 2. The FBI materials

Ferguson next claims that the motion court clearly erred in denying a new trial or other post-conviction relief based on his claim that the state failed to disclose exculpatory evidence pertaining to the FBI crime lab, including the FBI's entire file on the case, and any and all information about the serology, DNA, and hair and fiber units of the FBI lab. In addition, Ferguson makes the related claims that the motion court erred 1) in denying several motions to disclose a wide range of material that he asserted was pertinent to the *Brady* violation and 2) in denying his motion for new trial based on the FBI's failure to follow the motion court's order that Dr. Libby be allowed to inspect its original DNA case file. These claims fail for the same reasons the surveillance video claim fails—the *Brady* violation was not properly pled in the Rule 29.15 motion and discovery requests relating to the alleged *Brady* violations were thus foreclosed.

Assuming Ferguson had properly pled the Brady claim, he has not demonstrated that any of the FBI material would be exculpatory or prejudicial. Before trial he was provided with extensive information regarding the FBI tests and procedures,

and he used the information to thoroughly challenge the FBI evidence at trial, as demonstrated, for example, by the 54 pages of transcript of his cross-examination of the state's DNA expert. Ferguson does not clearly identify what he hopes additional FBI materials would show, and it appears that these materials, if any, could only be used to counter the FBI evidence in basically the same way that he countered that evidence at trial. Furthermore, it is worth noting that during the post-conviction proceedings Ferguson was able to obtain through the Freedom of Information Act at least 1,779 pages of FBI materials that have still not revealed any more exculpatory information than what he had before.

In denying relief, this Court is fully aware of Ferguson's allegation and request for discovery regarding FBI Agent Malone, who testified about the hair and fiber samples, and who has apparently been exposed for falsifying testimony in other cases. However, there is no evidence that Agent Malone acted improperly in this case, and it cannot fairly be said that the hair and fiber evidence had a prejudicial impact on the trial.

### 3. "South side rapist" materials

 Ferguson argues that the motion court clearly erred in denying his motion for disclosure of DNA materials from the "south side rapist," an alleged serial rapist who was at large during the time of Hall's abduction. Ferguson failed to include this argument in his Point Relied On, and therefore, this Court's review is for plain error/manifest injustice under Rule 30.20. *State v. Tooley,* 875 S.W.2d 110, 115 (Mo. banc 1994). Given the wholly speculative nature of the underlying claim that the south side rapist might be the true perpetrator, and the overwhelming evidence of Ferguson's guilt, especially the fact that Ferguson's DNA matched the semen found on Hall's clothing, no manifest injustice occurred. This claim fails for the additional reason that it is a claim of newly discovered evidence, which is not cognizable in a Rule 29.15 motion, even where properly pleaded and preserved. *State v. Stephan,* 941 S.W.2d 669, 679 (Mo. App.1997); *Wilson v. State,* 813 S.W.2d 833, 835 (Mo. banc 1991) (regarding Rule 24.035 post-conviction claims).

### B. Ineffective Assistance of Counsel Claims

Ferguson makes a number of claims of ineffective assistance of counsel in his amended Rule 29.15 motion. To establish that counsel was constitutionally ineffective, it must be shown that counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and that the deficient performance prejudiced the defendant. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to obtain an evidentiary hearing, Ferguson must allege facts, not refuted by the record, showing that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that he was thereby prejudiced. *State v. Jones,* 979 S.W.2d 171, 180 (Mo. banc 1998), *cert. denied,* 525 U.S. 1112, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999).

### 1. Failure to move for a change of judge

Ferguson claims that counsel was ineffective for failing to move for a change of judge based on the trial judge's alleged bias toward criminal defendants. The basis for this claim is that the trial judge received a "below average" rating on impartiality in a 1992 Missouri Bar Judiciary Evaluation survey and that trial counsel was aware that other public defenders were challenging the judge's impartiality in *State v. Smulls,* 935 S.W.2d 9 (Mo. banc 1996), *cert. denied,* 520 U.S. 1254, 117 S.Ct. 2415, 138 L.Ed.2d 180 (1997).

 This Court agrees with the motion court's finding that neither the 1992 sur-

vey nor the fact that the public defender's office had previously questioned and litigated the trial judge's impartiality on various grounds constitute facts that would lead a reasonable person to conclude that the trial judge was biased against Ferguson. A general survey does not necessarily indicate that a judge has prejudged issues in a particular case. Furthermore, the public defenders in *Smulls* challenged the trial judge's impartiality by alleging that he was biased against women and African–Americans, not that he was biased against white males like Ferguson.

### 2. Voir dire

Ferguson presents two ineffective assistance of counsel claims regarding voir dire: 1) that counsel should have moved to strike prospective juror Schleper for cause; and 2) that counsel should have moved to strike the entire group of prospective jurors who heard juror Rohan's comment supporting the death penalty.

The claim pertaining to Mr. Schleper is that he could not fully consider life imprisonment without the possibility of parole. The motion court found that Ferguson's claim was refuted by the record. This Court agrees. Although Mr. Schleper first indicated that he "kind of ... leaned toward" the death penalty, he then stated unequivocally that he would consider mitigating circumstances, would consider both possible penalties, and would follow the judge's instructions. *See State v. Ramsey*, 864 S.W.2d 320, 336 (Mo. banc 1993) (holding that the trial court did not err in overruling a challenge for cause of a venireperson who stated that he "leaned toward the death penalty"), *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). The ruling was not clearly erroneous.

The second complaint involves prospective juror Rohan's statement that "I am strongly for the death sentence. I would have difficulty if I believed that someone murdered someone believing that the country should support them the rest of their life." To establish that the entire jury panel should have been quashed based on one venireperson's statement, Ferguson must show that the statement was " 'so inflammatory and prejudicial that it can be said a right to a fair trial has been infringed.' " *State v. Smulls*, 935 S.W.2d at 19 (quoting *State v. Evans*, 802 S.W.2d 507, 514 (Mo. banc 1991)). Ferguson has not demonstrated that Ms. Rohan's statement was inflammatory and prejudicial because there was no suggestion that Ferguson, himself, deserved the death penalty, nor any attempt to encourage other venirepersons to impose the death penalty. The ruling was not clearly erroneous.

On this same point, Ferguson also contends that after Ms. Rohan made the statement, counsel should have attempted to educate the panel about the relative costs of life imprisonment and the death penalty. However, this Court has held that such economic concerns may not be addressed during voir dire, or at any time during trial, because they are completely irrelevant to any issue before the jury. *State v. Clay*, 975 S.W.2d 121, 142 (Mo. banc 1998), *cert. denied*, 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999). Therefore, counsel was not ineffective for failing to inform the jury on this information.

### 3. Guilt phase

#### a. Failure to investigate and present evidence

Ferguson claims that the motion court should have granted a hearing on his claims of ineffective assistance of counsel in the investigation and presentation of guilt phase evidence. This claim is difficult to establish because neither the failure to call a witness nor the failure to impeach a witness will constitute ineffective assistance of counsel unless such action would have provided a viable defense or changed the outcome of the trial. *State v. Hall*, 982 S.W.2d 675, 687 (Mo. banc 1998), *cert. de-*

*nied,* 526 U.S. 1151, 119 S.Ct. 2034, 143 L.Ed.2d 1043 (1999).

■ Ferguson is primarily critical of the failure to present witness testimony or other evidence to impeach state's witness Robert Stulce, who testified that he saw a brown and white Blazer that looked just like Ferguson's at the Mobil station and that he saw Kelli Hall get in the Blazer with a white male. Later, Stulce assisted police in making composite pictures of the man he had seen. He also viewed a police line-up that included Ferguson, and although he did not positively identify Ferguson, he indicated that Ferguson and one other man looked "similar" to the man he saw at the Mobil station.

■ Ferguson contends that counsel should have: 1) introduced one of the composite pictures of the person Stulce saw because it supposedly resembled Mel Hedrick more than Ferguson; 2) introduced a picture of Hedrick taken close to the time to the offense; 3) presented testimony that Hedrick did not have a beard at that time, contrary to his testimony; 4) introduced Stulce's prior inconsistent statement that the man he saw was a head taller than Hall; and 5) introduced Stulce's prior statement that he was sure that a man he later saw on I–70 was the man he saw at the Mobil station. These actions, according to Ferguson, would not only have impeached Stulce's testimony, but also would have linked Hedrick to the crime.

Impeaching Stulce's testimony either on cross-examination or by calling other witnesses would not have aided Ferguson. Stulce admitted that he could not identify the man he saw at the Mobil station, and he did not identify Ferguson at trial. He merely stated that the man looked "similar" to Ferguson. In addition, Hedrick testified at trial so that the members of the jury were able to see for themselves whether he had a resemblance to Ferguson and could have been the man at the Mobil station. But even assuming that counsel had done everything that Ferguson now suggests, and it had the desired effect of leading the jury to believe that Hedrick was at the Mobil station, it still would not have provided Ferguson with a viable defense. None of this evidence would have shown that Ferguson was not involved in the crimes.

■ Ferguson also faults counsel for failing to investigate and present evidence that co-defendant Ousley, state's witnesses Hedrick and Thompson, and even Kelli Hall and her boyfriend, were involved in the area drug scene. The apparent purpose of the evidence was to show that persons other than Ferguson had the motive or opportunity to commit the crimes against Kelli. As the motion court found, however, this evidence would have been inadmissible because it constituted evidence of the witnesses' prior bad acts. *State v. Clay,* 975 S.W.2d at 141–43. It also would have been inadmissible because it would not directly connect any of those persons with the *corpus delicti* of the crime and point to someone other than Ferguson as the guilty party. *See State v. Rousan,* 961 S.W.2d 831, 848 (Mo. banc 1998), *cert. denied,* 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). Finally, this is also the kind of evidence that, even if it was admissible, is not inconsistent with Ferguson's commission of every element of the crimes, as principal or accomplice.

### b. Juror misconduct

Ferguson contends in a cursory fashion that his counsel was ineffective for failing to make a record that one of the jurors was sleeping at trial and, thereafter, for failing to move to strike that juror for cause. He also claims that the jurors committed misconduct by disregarding the court's instructions to avoid news reports and discussions of the case. He subsequently filed a "Motion for Leave to Contact and Interview Petit Jurors" for discovery purposes that was denied after argument.

The motion court did not clearly err in denying these claims. In his Rule 29.15

motion, Ferguson did not allege "facts, not conclusions, that would entitle him to relief," and there is nothing in the post-conviction record to indicate that any juror was actually sleeping. In addition, Ferguson failed to plead any facts supporting his other claims of jury misconduct. The point is denied.

### c. DNA and blood evidence

Ferguson also argues that counsel was ineffective for failing to refute the state's DNA evidence. As noted, however, Ferguson's trial counsel engaged in extensive cross-examination of the state's DNA expert and called an expert witness for the defense, Dr. Libby, who challenged the state's findings and procedures. Counsel was not ineffective in this regard.

▇▇ Ferguson next claims that counsel should have insisted that blood samples be taken of Hall's boyfriend, Hedrick, and Thompson because those persons may have been type A secretors like Ferguson. This failure does not, however, show that counsel was ineffective. Even if these persons were type A secretors, blood evidence of that sort, which is found in a large percentage of the population, had little to do with establishing the identity of the perpetrator. Ferguson was convicted on the stronger evidence that his DNA "matched" the DNA extracted from the sample on Hall's coat.

▇▇ Ferguson further argues that counsel was ineffective for failing to show that Ousley could not have been excluded as the source of the semen on his own jeans. Again, Ferguson cannot show that he was prejudiced. The state never disputed Ousley's involvement, and, as previously discussed, implicating someone else, especially Ousley, would not exonerate Ferguson.

▇▇ Finally, Ferguson claims that counsel was ineffective for failing to present evidence that his "judgment, cognition and impulse control were substantially impaired" due to his mental condition and consumption of alcohol. However, this evidence, even if true, would have been inconsistent with his defense at trial. Ferguson testified that he could not have committed the crime because he "passed out" in the Blazer at the Shell station. Ineffective assistance of counsel cannot be established where counsel pursued one reasonable trial strategy to the exclusion of another. *State v. Harris*, 870 S.W.2d 798, 816 (Mo. banc 1994), *cert. denied*, 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994).

### d. The trial judge's efforts to expedite the trial

Ferguson also claims that trial counsel was ineffective for failing to preserve the challenge to the court "forcing trial to proceed late at night" and for failing to preserve his related motion for mistrial. The record shows, however, that counsel adequately preserved these matters for this appeal.

▇▇ In addition, Ferguson contends that trial counsel was ineffective for failing to object and preserve a challenge to the trial court's alleged efforts to expedite the entire course of the trial. He alleges, in particular, that the trial judge hurried through the trial so that he could go on a planned vacation. In support of the allegation, he states: 1) that the trial judge commented to the jury during voir dire that he intended to keep the trial moving along and he intended to complete the trial within two weeks; 2) that the trial judge allegedly remarked off the record that the case was interfering with his vacation plans; and 3) that the judge's wife and friends were present in the courtroom one day, apparently waiting for the trial to end. This evidence, even if true, does not in and of itself demonstrate trial court error. *See State v. Engleman*, 634 S.W.2d 466, 479 (Mo. banc 1982) ("the trial judge should act with the purpose of maintaining orderly procedure and expediting the trial without denying the defendant any right to which he is entitled under law."). More-

over, Ferguson has not shown how he was prejudiced.

■■■■■ Assuming the trial court erred, Ferguson's challenge still fails. In his Rule 29.15 motion, he did not claim counsel was ineffective for failing to preserve this challenge, and instead, he challenged the trial court's actions and rulings as a matter of trial court error, which, as the motion court properly determined, is not cognizable in a Rule 29.15 proceeding. Nevertheless, Ferguson attempts to transform this claim of trial court error into a cognizable ineffective assistance of counsel claim by citing *United States v. Cronic,* 466 U.S. 648, 659–62, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), for the proposition that external forces can render counsel constitutionally ineffective even when counsel performed as well as a reasonably competent attorney could have performed under the circumstances. This is true, however, only when "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60, 104 S.Ct. 2039. Here, such a presumption is not appropriate. Even if Ferguson could overcome the initial hurdle of demonstrating that counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, he does not show that he was prejudiced by the trial court's actions.

### 4. Penalty phase

### a. Failure to investigate and present evidence

■■■■■ Ferguson claims that counsel was ineffective for failing to investigate and present certain penalty phase evidence. More specifically, he states that counsel should have presented three expert witnesses, either in addition to or instead of the two expert witnesses that were called. These three witnesses, according to Ferguson, would have testified regarding the effect of his past and present alcohol and drug addiction, his intelligence, his genetic predisposition to a major depressive disorder, and his family history of mental illness and alcoholism. Ferguson also contends that counsel should have called twenty-six lay witnesses, in addition to the eight lay witnesses that were actually called, to testify about his good character and other mitigating circumstances in his background.

This additional evidence would have been cumulative. The two experts who were called did testify, at length, about Ferguson's intelligence, depression and substance abuse. Further, the eight lay witnesses testified about his devotion to his family, his good character, his problems with seizures, his problems with drugs and alcohol, and other details about his background. This was ample evidence in support of mitigation, and counsel's failure to present additional evidence that would have been cumulative does not amount to ineffective assistance of counsel. *See State v. Johnston,* 957 S.W.2d 734, 755 (Mo. banc 1997), *cert. denied,* 522 U.S. 1150, 118 S.Ct. 1171, 140 L.Ed.2d 181 (1998). The point is denied.

### b. Trial court's remarks at sentencing

■■■ Ferguson contends that trial counsel was ineffective for failing to object to the trial court's derogatory remarks at sentencing. These remarks included, "You deserve the death penalty more than any case I've ever had in my life. And when I see those pictures of that young woman, it even makes my blood boil a little bit." Ferguson maintains that these remarks demonstrated a bias and hostility toward him, although he does not state exactly what relief trial counsel should have sought. Regardless, the motion court did not clearly err in finding that the record did not support the claim, and that Ferguson had not overcome the presumption that judges do not consider improper evidence in sentencing. The judge's remarks were made during, not before, pronounce-

ment of the sentence and were made to explain the sentence, and therefore, they do not establish disqualifying bias. *See State v. Whitfield,* 939 S.W.2d 361, 368 (Mo. banc), *cert. denied,* 522 U.S. 831, 118 S.Ct. 97, 139 L.Ed.2d 52 (1997). Furthermore, the trial court's comments in this case are not unlike allegedly derogatory comments in other cases that this Court held were not improper. *See, e.g., Haynes v. State,* 937 S.W.2d 199, 201–02 (Mo. banc 1996).

### 5. Remaining ineffective assistance of counsel claims

Ferguson's remaining allegations of ineffective assistance counsel are based on claims discussed and denied in the sections of this opinion dealing with trial court error. They include that counsel was ineffective for failing to: 1) object and preserve claims regarding the trial court's limitations on voir dire; 2) challenge the admissibility of the DNA evidence; 3) object to the hearsay statements admitted through the testimony of Alicia Medlock and Mike Thompson; 4) object to nine comments made in the closing arguments of the guilt phase; 5) object on proper grounds to the verdict director for first-degree murder; 6) adequately examine Ferguson's two penalty phase experts, Dr. O'Connor and Dr. Smith; 7) object to the admission of unadjudicated bad acts in the penalty phase; 8) object to seven comments made by the prosecutor during the penalty phase closing argument; and 9) object on proper grounds to the penalty phase instructions on the statutory and non-statutory aggravating circumstances. As noted, none of these claims resulted in manifest injustice entitling Ferguson to plain error relief, and indeed, most claims did not constitute error in the first place. As to those few claims that did constitute error, none were prejudicial; none resulted in a "reasonable probability" that the outcome of the trial would have been different, as required to show ineffective assistance of counsel under *Strickland.*

### C. Motion Court's Adoption of the State's Proposed Findings

■ Ferguson contends that the motion court erred in adopting the state's proposed findings of fact and conclusions of law verbatim, which shows that the court did not exercise independent judgment in denying relief without a hearing, and thus constituted a denial of due process. For support, Ferguson points to the fact that the motion court filed its findings, conclusions, and order the same day the state submitted its proposal.

■ In the absence of independent evidence that the court failed to thoughtfully and carefully consider the claims, "there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties." *State v. Kenley,* 952 S.W.2d 250, 261 (Mo. banc 1997), *cert. denied,* 522 U.S. 1095, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998). *See also State v. Basile,* 942 S.W.2d 342, 362 (Mo. banc 1997), *cert. denied,* 522 U.S. 883, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997); *State v. Phillips,* 940 S.W.2d 512, 521 (Mo. banc 1997). In this case, the record reflects that the motion court exercised independent judgment. The court held a lengthy hearing to determine whether any of Ferguson's claims warranted an evidentiary hearing, and then having been advised by the parties, ruled from the bench that the claims were denied. He invited both parties to submit proposed findings of fact and conclusions of law, but Ferguson declined to do so. The motion court's entry of its findings, conclusions and order on the same day that the state filed its proposals proves nothing more than that the court was able to give the matter immediate attention. The point is denied.

### IV. PROPORTIONALITY REVIEW

■ Under section 565.035.3, RSMo 1994, this Court is required to determine:

1) Whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor;

2) Whether a statutory aggravating circumstance and any other circumstances found by the trier of fact were supported by the evidence; and

3) Whether the sentence is excessive or disproportionate to the punishment imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

From this Court's review of the record, there is no evidence that the sentence of death was imposed under the influence of passion or prejudice or any other arbitrary factors. Further, the evidence amply supports the four statutory and two non-statutory aggravators found by the jury. Finally, the imposition of the death penalty in this case is neither excessive nor disproportionate. In that regard, the strength of the evidence and the circumstances of the crime far outweigh any mitigating factors in Ferguson's favor. In addition, this case is like many others where the death penalty has been imposed against defendants who have murdered victims they had abducted and against whom they had committed sexual offenses. *See, e.g., State v. Brooks,* 960 S.W.2d 479, 502 (Mo. banc 1997), *cert. denied,* 524 U.S. 957, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998); *State v. Nunley,* 923 S.W.2d 911, 926 (Mo. banc 1996), *cert. denied,* 519 U.S. 1094, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997); *State v. Brown,* 902 S.W.2d 278 (Mo. banc 1995), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995); *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995); *State v. Lingar,* 726 S.W.2d 728, 741–42 (Mo. banc), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

## CONCLUSION

For the foregoing reasons, the judgments are affirmed.

All concur.