Frankey Lane CODAY, Movant–
Appellant/Respondent,

v.

STATE of Missouri, Respondent–
Respondent/Cross–Appellant.

Nos. 26327, 26351.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 30, 2005.

Rosalynn Koch, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stephanie Morrell, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Chief Judge.

Frankey Coday ("Coday") was convicted of first degree murder and armed criminal action in connection with the death of M.R.L. ("Victim"). Coday filed a Rule 29.15 motion to vacate, set aside or correct his judgment and sentences.[1] The motion court sustained the motion and granted Coday a new trial because the judge concluded Coday's trial counsel had been ineffective in three respects. The State of Missouri has appealed from that order. Coday has cross-appealed, contending the motion court should have granted the same relief on four additional grounds. After reviewing the entire record, this Court is left with the firm and definite impression that the motion court made a mistake in vacating Coday's sentences and granting him a new trial. Accordingly, that order is reversed, and the case is remanded with directions to enter an order denying Coday's Rule 29.15 motion.

## I. Facts and Procedural History

Just as in a direct appeal, we must view the facts in the light most favorable to the verdict. *Rousan v. State,* 48 S.W.3d 576, 579 (Mo. banc 2001). There-

---

1. All references to rules are to the Missouri Court Rules (2005).

fore, all evidence and inferences favorable to the verdict are accepted as true, and all contrary evidence and inferences are disregarded. *Id.* at 595. Accordingly, we begin by summarizing, in accordance with the foregoing principles, the evidence presented at Coday's criminal trial.

In November 1990, Coday owned some real estate six miles north of Hartville. He lived in an old school bus parked on the property. The bus had been converted into a home. He worked for Boone Township as a grader operator. The gravel roads he graded ran from Sunshine Road to Pleasant Hill and back up to Ely Road. In addition to being a grader operator, he also ran a custom backhoe business. Coday owned an old blue work van and a dump truck that he used for work.

Victim and her mother lived in Hartville, Missouri, with Victim's aunt, LaDonna Streeval. Victim attended high school in Hartville. On the evening of November 23, 1990, Victim had an argument with her mother. Between 7:30 and 8:00 p.m., Victim left Streeval's home and began walking down a gravel road called Sunshine Road. She was wearing a two-piece set of plaid pajamas and white tennis shoes. Between 8:30 and 9:00 p.m. that same evening, Victim went to the home of Cynthia Curtner, a Hartville florist. Victim was crying and asked to use Curtner's telephone. Victim was wearing plaid pajamas and was alone. She only stayed long enough to dial one telephone number. When no one answered, she left and walked back toward the road. About 20 to 30 minutes later, Curtner heard a vehicle come down the road.

Dwayne Coltrane lived on a small farm near Hartville. Coday lived four or five miles away. At approximately 11:30 p.m. on November 23rd, Coltrane observed Coday's dump truck sitting at the intersection of F Highway and Alva Road. The truck's lights were illuminated, and it appeared to be getting ready to turn right and head back toward Highway 5.[2]

On November 26, 1990, Roy McDaris was running his normal morning route as a school bus driver. At approximately 7:15 a.m., McDaris was driving on Morton Road when he noticed Victim's nude body laying face up in a field beside the road. McDaris recognized Victim as one of the students who rode his bus. He called the police and waited for them at the scene. Morton Road is located approximately five miles north of Hartville off of Highway 5. Morton Road connects with F Highway via Alva Road.

When Missouri State Highway Patrol troopers arrived, they conducted an investigation of the crime. Victim's body was located about 75 feet off of Morton Road in a briar patch. There was a gap in the fence separating the road from the field where Victim's body was found. A piece of briar two feet long was protruding from Victim's vagina. About four feet from Victim's body, the troopers found a large rock with Victim's blood on it. The rock was lying near a large pool of blood on the ground that had soaked two or three inches down into the soil. A Busch beer can was found in the immediate area of the body. Victim's plaid pajama top was recovered from the road ditch. A boot print, whose tread design was later determined to be consistent with the type of combat

---

**2.** Although Coday claimed he had nothing to do with Victim's murder and presented an alibi defense, he admitted that he was driving his dump truck on Morton Road and at the intersection of F Highway and Alva Road on the evening of November 23rd. Coday also admitted that Coltrane's testimony about the time he saw Coday's dump truck could be accurate.

boots worn by Coday, was found in the ditch.

An autopsy was performed on Victim's body the same day it was discovered. The absence of rigor mortis meant Victim had died approximately 36 to 48 hours earlier. There was a massive injury to the back of her head, which caused a skull fracture, extensive brain injury and hemorrhage around her brain. The blow to the back of Victim's head also dislocated her spine. Victim's body exhibited decerebrate posturing, which meant the toes of Victim's feet were pointing downward. This indicated that Victim died a fairly slow death and may have lingered up to an hour after the mortal blow was struck. The rock found at the scene could have been used to inflict this blow. Before Victim died, she was severely beaten. She had suffered at least 10, and probably more, fist-type blows to her head. These blows caused extensive bruising to her face, lips, nose, ears and throat. There was a one-inch laceration on Victim's right forehead that extended down to her skull. This wound, which could have caused unconsciousness, was inflicted by some round-shaped object like a pipe that was used to forcibly strike Victim. She also had numerous scratches, scrapes and bruises on her torso and legs. Her hands showed defensive injuries that resulted from her efforts to ward off blows. Victim's wrists, ankles and feet had circumferential, restraint-type bruises that showed Victim had been forcibly held down. There was another restraint-type injury caused by someone tightly gripping her upper left arm. There were deep scratches on her inner thighs which were consistent with being "sawed on" with a briar. These injuries were torture-type injuries designed to inflict pain. Victim's external genitalia were bruised and swollen, indicating forcible sexual intercourse. She was sexually assaulted numerous times, and sperm was found on swabs taken from Victim's vagina and rectum. The briar found in Victim's vagina was probably inserted after she was dead.

In November 1990, Dickie Moore was 15 years old and resided in Hartville. He knew Coday and was acquainted with Victim through school. Two days after Victim's body was discovered, Dickie went to a party at Clarence Landsdown's residence. Coday and Carlos Greathouse ("Greathouse") also attended Landsdown's party. While Coday and Greathouse were standing outside, Dickie heard them talking about how they had killed Victim. They had been drinking and were probably drunk at the time. Greathouse asked Coday if he was successful, and Coday nodded his head affirmatively. Greathouse asked "if she was dead." Coday said, "Who, [Victim]?" Greathouse nodded affirmatively and said the only thing he did was rape Victim. Coday responded by stating that Greathouse had helped drag Victim up to and through the fence. After hearing these statements, Dickie walked off because he was scared that they had seen him listening to their conversation.

In November 1990, William Moore was 20 years old. He knew Coday and Greathouse. The three of them would get together to drink and ride around the county roads together. Three or four days after Victim's body was found, William attended a party at Coday's house. Greathouse was there as well. Both Coday and Greathouse were drinking. While William was standing five or six feet away, he heard Coday and Greathouse talking about how they would like to "do" another young girl. During that conversation, William overheard Coday and Greathouse disclose the following information: (1) they picked up the girl and put her in the van; (2) they had sex with her; (3) Coday hit Victim in the head with a pipe; (4) Coday also said he hit Victim in the back of the head; (5)

Greathouse replied that Coday didn't have to do that; (6) they threw her body over a fence and into a briar patch; (7) they could have put the body somewhere else besides the gravel road off F Highway; and (8) "if they had another chance, they would do it again, because something about it was good or it wasn't like an older lady." The conversation caught William's attention "because he thought it was sick." A week or two after this party, William saw drops of blood in Coday's blue work van. The blood was located three or four feet from the van's back door.

Sometime between three weeks and three months after Victim was killed, Leslie Holloway attended a party at Clarence Landsdown's residence. She had been acquainted with Coday for about 14 years. By 3:00 a.m., Coday was drunk. He told Holloway that he could kill people and get away with it. He started describing how Victim was murdered. Coday said he and two other men were riding around checking the gravel roads that Coday graded. The men saw Victim walking on Sunshine Road. Victim, who was wearing pajamas, was upset and wanted a ride to town. They picked her up and went riding around. The men stopped on a gravel road. They ripped off Victim's pajama bottoms and threw them away. The men then took turns raping her. Coday hit Victim in the head with a rock. They dumped Victim's body on a gravel road. She was left lying on the ground with a briar stuck in her vagina. Coday threatened Holloway by stating that if she told the police what he had said, he would do the same thing to her that he did to Victim or worse.

In January 1992, Jerre Crapo was working at Midway Furniture. She had known Coday and Greathouse for 10 to 15 years. Coday came into the store to pick up some furniture. He began drinking with and talking to another employee there named Jay Couch. Crapo overheard Coday bragging about Victim's murder with Couch. Coday said he and Greathouse picked Victim up on a gravel road. They beat her and took turns raping her. They killed her by hitting her in the head, and they stuck sticks up inside of her. They threw Victim's body over a fence and left. Coday apparently realized Crapo heard what was said. Coday told Crapo that if she repeated anything she had heard, she would end up just like Victim.

In September or October 1993, Coday discussed the crime with Billy Liles. Coday said he returned to the scene of the crime in his dump truck. He used the dump truck to cover the tire tracks left there by his blue work van.

In 1995, Coday was charged in separate indictments with committing the class A felonies of murder in the first degree and armed criminal action for causing Victim's death. See §§ 565.020; 571.015.[3] The indictments alleged that Coday, either acting alone or knowingly in concert with another, killed Victim after deliberation by striking her with a dangerous instrument. A jury found Coday guilty of both offenses. The trial court imposed consecutive sentences of life in prison without probation or parole on the murder conviction and three years imprisonment on the armed criminal action conviction. In July 1998, this Court affirmed Coday's convictions in a *per curiam* order and unpublished memorandum opinion filed pursuant to Rule 30.25(b).

In October 1998, Coday filed a *pro se* motion to vacate, set aside or correct judgment or sentence pursuant to Rule 29.15. Counsel was appointed, and an amended

**3.** All references to statutes are to RSMo (2000).

motion was filed in April 1999. In May 2004, the motion court entered an order vacating Coday's sentences and granting him a new trial.[4] The motion court concluded that Coday received ineffective assistance of counsel because his trial attorney failed to: (1) impeach one of the State's witnesses; (2) ask for a modification of an accomplice liability instruction; and (3) object to hearsay testimony implicating Coday in Victim's murder. Additional facts necessary to our analysis of the case are included below as we address the parties' points on appeal.

## II. Standard of Review

Coday's amended motion contends his trial counsel was ineffective in numerous respects. Coday bears the burden of proving his contentions. Rule 29.15(i). To determine whether an attorney provided ineffective assistance to a criminal defendant, we apply the standards established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail, Coday must prove that: (1) counsel's performance did not conform to the degree of skill, care and diligence of a reasonably competent attorney; and (2) counsel's poor performance prejudiced the defense. *Deck v. State*, 68 S.W.3d 418, 425 (Mo. banc 2002). For prejudice to exist, Coday must prove "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 426 (italics in original). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Coday must prove each portion of this two-pronged performance and prejudice test in order to succeed on his ineffective assistance of counsel claim:

> A criminal defendant must satisfy *both* the performance prong and the prejudice prong to prevail on an ineffective assistance of counsel claim. In reviewing such a claim, courts are not required to consider both prongs; if a defendant fails to satisfy one prong, the court need not consider the other. And, a court need not determine the performance component before examining for prejudice. If it is easier to dispose of the claim on the ground of lack of sufficient prejudice, the reviewing court is free to do so.

*Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987) (italics in original).

In the case at bar, the trial court's order contained findings of fact and conclusions of law. Our review is "limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." Rule 29.15(k); *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996). Findings of fact and conclusions of law are clearly erroneous only when, after reviewing the entire record, this court is left with the definite and firm impression that a mistake has been made. *State v. Taylor*, 929 S.W.2d 209, 224 (Mo. banc 1996).

## III. Discussion and Decision

As noted above, both the State and Coday have appealed from the motion court's rulings on Coday's Rule 29.15 motion. The issues raised by the State will be addressed first.

### A. The State's Appeal

In the State's first point, it challenges the motion court's ruling that Co-

---

**4.** The judge who decided Coday's Rule 29.15 motion was not the same judge who tried the underlying criminal case.

day is entitled to a new trial because his trial counsel was ineffective for failing to impeach prosecution witness Billy Liles. The following additional facts are relevant to this issue.

In April 1995, Billy Liles was interviewed by the Wright County police. They had received information suggesting Billy knew something about Victim's murder. The officers read Billy his rights and told him Coday and Greathouse had been charged with murder and were in jail. Billy was afraid he would be charged with murder if he cooperated with them; however, he ultimately agreed to testify against Coday and Greathouse. In exchange, he would be allowed to plead guilty to sexually assaulting Victim. The deal was contingent on giving truthful testimony, and Billy was not to be sentenced until after he testified at both of their trials.

Pursuant to this agreement, Billy testified at Coday's trial. Near the beginning of Billy's direct examination, he was questioned about the deal he struck with the State in exchange for his testimony. Billy admitted that he had pled guilty to sexually assaulting Victim prior to her death and was awaiting sentencing. Pursuant to the plea deal, he was facing a maximum of seven years in prison or as little as five years probation for committing this crime against Victim. Thereafter, Billy testified that he, Coday and Greathouse were riding around in Coday's blue work van on the evening of November 23rd. The men were drinking heavily. They saw Victim walking along a gravel road and picked her up. According to Billy, he had "consensual sex" with Victim. Greathouse became angry that Victim would not agree to have sex with him. He and Victim got out of the van and argued loudly. A short time later, Greathouse got back in the van alone. When Billy asked about Victim,

Greathouse said he hit her in the head with a rock. He did not know if she was dead. The men drove away in the van. At Coday's suggestion, they returned to the scene and found Victim lying in a ditch. Greathouse could not hear a heartbeat, and he could not tell if Victim was breathing. Greathouse and Coday loaded Victim's body in the back of the van. They drove to a location on Morton Road. Billy remained in the van while Coday and Greathouse took Victim's body and put it over a fence. Coday returned in about two minutes, and Greathouse was gone about 15 minutes. The trio drove away, only to return a short time later because Greathouse said he forgot something. He got out of the van and returned with Victim's underwear. The men took this clothing to another area and burned it. Coday then took Greathouse and Billy to Coday's residence.

Leslie Holloway was deposed before trial. In her deposition, she testified that Billy said he raped Victim. At trial, Coday's counsel did not use this statement in an attempt to impeach Billy's testimony. The motion court concluded that counsel was ineffective for failing to do so. The court also concluded Coday was prejudiced because a reasonable probability existed that the outcome of his trial would have been different if counsel had presented evidence concerning this single statement made by Billy. The court gave no clue as to the reasoning process it used to arrive at this naked conclusion.

The State contends that the motion court clearly erred in concluding that Coday was entitled to a new trial because his counsel did not use Holloway's deposition testimony to impeach Billy. The State argues the suggested impeachment of Billy's testimony would not have provided Coday with a viable defense or changed the outcome of the trial. We agree.

It is well-settled that counsel's failure to impeach a witness will not constitute ineffective assistance of counsel unless this action would have provided the defendant with a viable defense or changed the outcome of the trial. *See State v. Ferguson*, 20 S.W.3d 485, 506–07 (Mo. banc 2000); *State v. Hall*, 982 S.W.2d 675, 687 (Mo. banc 1998). Furthermore, counsel will not be found ineffective for failing to present cumulative impeachment evidence. *Hall*, 982 S.W.2d at 686; *State v. Whitfield*, 939 S.W.2d 361, 370 (Mo. banc 1997).

We are unable to discern any way that the proposed impeachment of Billy's testimony would have provided Coday with a viable defense to the charge of first degree murder. The State presented testimony from four witnesses (Dickie Moore, William Moore, Leslie Holloway and Jerre Crapo) that Coday admitted murdering Victim. In these admissions, Coday disclosed a number of very incriminating details about how and where he murdered Victim. Furthermore, Coday made very similar threats to kill Holloway and Crapo if they talked to police, which exhibited consciousness of guilt. *See State v. Barton*, 998 S.W.2d 19, 28 (Mo. banc 1999) (conduct and declarations of a defendant that are relevant to show a consciousness of guilt or a desire to conceal the offense are admissible because they tend to establish the defendant's guilt of the charged crime). Impeaching Billy's testimony would not have negated the very damaging admissions by Coday that he was the person who killed Victim. *See Tate v. State*, 675 S.W.2d 89, 91 (Mo.App.1984). Accordingly, the jury could have found that Coday was guilty of murdering Victim irrespective of whether she had first been raped by Billy.

We also fail to see how this proposed impeachment creates a reasonable probability that the trial's outcome would have been different. "If a prior inconsistent statement by a state's witness does not give rise to a reasonable doubt as to defendant's guilt, such impeachment evidence is not the basis for a claim of ineffective assistance of counsel." *State v. Twenter*, 818 S.W.2d 628, 640 (Mo. banc 1991). Billy was not the key witness against Coday. Although he claimed to have been present and witnessed what occurred, his testimony was not necessarily very helpful to the State. Indeed, Billy's account of events did not square with the physical evidence of the crime. For example, the medical examiner testified that both of Victim's wrists and both of her ankles bore marks showing that she was forcibly restrained. She had been sexually abused numerous times, and sperm was found in her vagina and rectum. She had been subjected to having her thighs "sawed on" with a briar before her death in a torture-like manner designed to inflict pain. Billy's testimony fails to adequately explain how Greathouse could have inflicted such injuries by himself during the short time he and Victim were together outside the van. Billy's testimony was further contradicted by the many witnesses who heard Coday admit that he killed Victim and provide many incriminating details about the murder. To illustrate, William Moore testified that he heard Coday admit striking Victim in the head with a pipe. The medical examiner testified that Victim had sustained an injury to her forehead that was caused by a round-shaped object like a pipe. Billy's version of events fails to account in any way for this injury to Victim. On the whole, all Billy's testimony did for the State was to provide some corroboration for the State's other evidence that Coday was involved in Victim's murder. For example, Dwayne Coltrane testified that he saw Coday's dump truck at the intersection of F Highway and Alva Road at about

11:30 p.m. on the evening of November 23rd. This intersection is very near the site on Morton Road where Victim's body was discovered. Billy testified that, in 1993, Coday admitted he returned to the scene of the murder in his dump truck to cover tire tracks left by his blue work van. Thus, Billy's testimony corroborated Coltrane's observation of the dump truck near the scene of the murder and helped explain the relevancy of this observation in identifying who murdered Victim.

Finally, the only purpose served by this proposed impeachment was to challenge Billy's assertion that he had "consensual sex" with Victim. Billy admitted in his direct examination that he had already pled guilty to sexually assaulting Victim before her death. A person commits the crime of sexual assault by having sexual intercourse with another person knowing that he does so without that person's consent. *See* § 566.040. By admitting this sexual assault on Victim, Billy effectively impeached his own testimony on this very issue before cross-examination ever began. Further impeachment of Billy, using his statement to Leslie Holloway, would have been cumulative. Therefore, counsel cannot be found ineffective for failing to impeach Billy. *See State v. Hall,* 982 S.W.2d 675, 686 (Mo. banc 1998); *State v. Whitfield,* 939 S.W.2d 361, 370 (Mo. banc 1997).

After reviewing the entire record, this Court is left with the definite and firm impression that a mistake has been made. The motion court clearly erred in granting Coday a new trial on the ground that his counsel was ineffective for failing to impeach Billy. The State's first point is granted.

■ In the State's second point, it challenges the motion court's ruling that Coday is entitled to a new trial because his trial counsel was ineffective for failing to request a modification of Instruction No. 5,

the accomplice liability instruction. The following additional facts are relevant to this issue.

At trial, Coday contended that he had nothing whatsoever to do with Victim's murder. Through his own testimony, as well as that of his wife and friends, he presented an alibi defense to account for his activities and whereabouts from Friday, November 23rd through Monday, November 26th. At the State's request, the trial court gave Instruction No. 5, which was based upon MAI–CR 3d 304.04. This instruction read as follows:

> A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with him with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

Coday asserted that his counsel was ineffective for failing to request that Instruction No. 5 be modified to read as follows:

> A person is responsible for his own conduct and he is also responsible for the conduct of (another person) (other persons) in committing an offense if, before or during the commission of an offense, he acts with the other person(s) with the common purpose of committing that offense, or if, before or during the commission of an offense, for the purpose of committing that offense, he aids or encourages the other person(s) in committing it. The commission of an offense includes immediate flight therefrom.

*See* Notes on Use 8, MAI–CR 3d 304.04. During the post-conviction evidentiary hearing, Coday's counsel testified that she did not request this modification because it would have been inconsistent with Coday's alibi defense. The motion court concluded counsel was ineffective in not asking for

the modification because the jury could have been misled into believing that they could convict Coday "based on evidence as to assistance he gave *after* [Victim] received a fatal blow to her head by Carlos Greathouse. There was evidence at trial that [Victim] was dead before movant [Coday] became involved in transporting her body (*see* Tr. 510–511)." The court further concluded that Coday's counsel did not have a strategic reason for not asking for the modification.

The State argues the motion court's conclusion is clearly erroneous because the modified instruction would have required evidence that Coday's actions in support of the murder only took place after it was completed, and it would have been inconsistent with counsel's defense strategy. We find both arguments have merit.

Coday's argument that Instruction No. 5 should have been modified is based upon Notes on Use 8, MAI–CR 3d 304.04. This note states the above-quoted modification will be made on request of the defendant "[i]n cases where, in addition to evidence of the defendant's assisting or encouraging before or during the offense, *there is evidence of assistance or encouragement occurring after the offense has been completed, and the defendant contends that the only aid, if any, provided by the defendant occurred after the offense was completed* . . . ." (Emphasis added.) Neither requirement for modification is present here.

■ It is axiomatic that instructions must be supported by substantial evidence and the reasonable inferences to be drawn therefrom. *State v. Thompson*, 112 S.W.3d 57, 69 (Mo.App.2003). The motion court concluded that counsel should have asked for the modification set out in Notes on Use 8 because there was evidence Victim was dead before Coday helped transport her body. The motion court's conclusion is clearly erroneous because evidence

presented at trial cannot reasonably support that inference.

The physical evidence, which was unchallenged at trial, proves that Victim was killed at the location where her body was found. The rock used to kill her was found only a few feet from her body. Victim's blood was found on the rock. Victim's body was covered with a multitude of scratches, including severe scratches inflicted on her inner thighs in a torture-type manner. These scratches were inflicted before she died because the wounds showed evidence of blood beading and bruising, which would cease when Victim's heart stopped beating. Her body was found in a briar patch, which explains the means by which the scratches were inflicted and also accounts for the briar that was found in her vagina when the body was discovered. There was no evidence presented at trial that Victim was ever in any other location where briars were present. A large pool of blood, which had soaked several inches into the ground, was found next to Victim's body. She exhibited decerebrate posturing, which indicated that it had taken up to an hour for her to die. Thus, none of this evidence would support the reasonable inference that Victim was already dead when Coday and Greathouse dragged her body into the briar patch.

Billy Liles' testimony also failed to reasonably support any such inference. According to Billy, he asked Greathouse if Victim was dead after Greathouse got back in the van. He said he did not know. When Billy, Coday and Greathouse returned later, they found Victim lying in a ditch. Greathouse still could not tell whether Victim was dead. He was unable to tell if she was breathing, and his method of checking for a heartbeat consisted of simply laying his head on Victim's chest. In the face of the uncontroverted and strong physical evidence detailed above,

this testimony in no way supports the motion court's conclusion that Victim was already dead when she was placed back in Coday's van. Accordingly, the jurors were presented with no substantial evidence from which they could reasonably conclude that Coday only provided aid to Greathouse after the murder was committed. That being the case, there was no evidentiary basis for asking that Instruction No. 5 be modified by including the language contained in Notes on Use 8. *See State v. Williams*, 18 S.W.3d 425, 436–37 (Mo.App. 2000) (the modification contained in Notes on Use 8 was "clearly inapplicable" where defendant contended he was not involved in cattle theft at all, he presented no evidence that he only provided aid after the offense was completed, and he did not claim the state's evidence would support such a finding).

■ Modification of Instruction No. 5 would have been inappropriate for another reason as well. Whenever there is an MAI–CR instruction applicable under the law and Notes on Use, that instruction is to be given to the exclusion of any other instruction. Rule 28.02(c); *State v. Ervin*, 835 S.W.2d 905, 922–23 (Mo. banc 1992); *Deckard v. State*, 110 S.W.3d 891, 895–96 (Mo.App.2003). Notes on Use 8 states, in pertinent part, that the modification contained therein is to be given *at the defendant's request* when "the defendant contends that the only aid, if any, provided by the defendant occurred after the offense was completed...." Coday never contended at trial that he was involved in Victim's murder, but only provided aid after the offense was completed. For that reason, a necessary precondition to utilizing the modification did not exist. *See Williams*, 18 S.W.3d at 436–37. Instead, Coday's trial counsel made the strategic decision to present an alibi defense. Pursuant to that strategic decision, Coday contended, and

so testified, that he had nothing to do with the crime and was somewhere else when it was committed. In addition to Coday's testimony, a number of other witnesses were called to support that defense. Asking for this modification would have been inconsistent with counsel's theory of defense. Thus, the motion court's finding that counsel identified no strategic reason for failing to ask that Instruction No. 5 be modified is clearly erroneous. "Ineffective assistance of counsel cannot be established where counsel pursued one reasonable trial strategy to the exclusion of another." *State v. Ferguson*, 20 S.W.3d 485, 508 (Mo. banc 2000). In *Ferguson*, the defendant was accused of murder. At trial, he contended that he could not have committed the crime because he was passed out in his vehicle when the murder occurred. After being convicted, Ferguson filed a Rule 29.15 motion alleging that trial counsel was ineffective for failing to present evidence that Ferguson's judgment, cognition and impulse control were substantially impaired due to his mental condition and consumption of alcohol. On appeal, his argument was rejected because "this evidence, even if true, would have been inconsistent with his defense at trial." *Id.* Here, Coday contended he had nothing to do with Victim's murder and was elsewhere when it was committed. An alibi defense was a reasonable trial strategy under the circumstances presented. Arguing that Coday was involved in the murder, but only provided aid after the offense was completed, was not compatible with his alibi defense. Counsel cannot be deemed ineffective for failing to pursue an alternative defensive theory that severely undermined her main defense strategy. *See Vogel v. State*, 31 S.W.3d 130, 143–44 (Mo.App.2000) (where defendant contended that he had been mistakenly identified by the state's witnesses as the shooter, counsel was not ineffective for failing to

pursue the incompatible defense that defendant shot the victim in self-defense or acted out of sudden passion).

After reviewing the entire record, this Court is left with the definite and firm impression that a mistake has been made. The motion court clearly erred in granting Coday a new trial on the ground that his counsel was ineffective for failing to request a modification to Instruction No. 5. The State's second point is granted.

■ In the State's third point, it challenges the motion court's ruling that Coday is entitled to a new trial because trial counsel was ineffective for failing to object to William Moore's testimony about various statements made by Greathouse. The statements made to William, and the circumstances under which they took place, have been summarized earlier in this opinion. The motion court concluded that counsel was ineffective for failing to object to this testimony because it was hearsay, violated Coday's right to confrontation and was prejudicial because one of the statements "constituted the only specific evidence at trial that [Coday] himself had dealt a death blow." In so concluding, the motion court relied on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The State argues the motion court's conclusion is clearly erroneous because William's testimony was admissible, and a hearsay objection would have been overruled as meritless. We agree.

We begin by noting that the motion court's reliance on *Bruton* is misplaced. There, Bruton and Evans were tried jointly for armed robbery. Evans did not testify, but his confession to a postal inspector was admitted in evidence. The confession inculpated Bruton in the robbery. The jury was instructed that it should not consider Evans' confession in determining Bruton's guilt. The United States Supreme Court held that the admission of Evans' confession denied Bruton his right of confrontation:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of the failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Id.* at 135–36, 88 S.Ct. 1620 (citations omitted). In our view, *Bruton* is distinguishable from the case at bar.

The first important distinction is that Coday and Greathouse were not tried together in a joint trial. Since Coday was the only defendant on trial, the jurors were not placed in the untenable position of being required to consider Greathouse's statements to determine his guilt while excluding those statements from consideration in assessing Coday's guilt. Accordingly, *Bruton* is not controlling here.

Another critical distinction is that, in *Bruton*, "[Evans'] hearsay statement inculpating [Bruton] was clearly inadmissible against him under traditional rules of evidence . . . . and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." *Bruton*, 391 U.S. at 128 n. 3, 88 S.Ct. 1620.[5] Here, the conversation be-

---

**5.** In view of the recent decision by the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), it is doubtful that the admission of nontestimonial hearsay pursuant to state evidentiary rules constitutes a viola-

tween Greathouse and Coday was admissible against Coday under traditional rules of evidence.

▮▮▮▮ Both Coday and the State agree that any statements made by Coday were admissible as the admission of a party-opponent. Such admissions are not properly considered hearsay at all. *State v. Howell*, 143 S.W.3d 747, 751 (Mo.App. 2004); *Still v. Ahnemann*, 984 S.W.2d 568, 572 (Mo.App.1999); *State v. Brown*, 833 S.W.2d 436, 438–39 (Mo.App.1992). Thus, William Moore's testimony that he overheard Coday say he hit Victim in the back of the head was simply not hearsay. *Howell*, 143 S.W.3d at 751. Of equal import is the correlative principle that an admission by a party-opponent can include not only statements made directly by the party, but also statements with which a party tacitly agrees. Thus, "the tacit admission rule can be used to show acquiescence in the truth of an incriminating statement when the accused fails to deny, contradict, or object to an accusatory statement made in his or her presence." *State v. Williams*, 118 S.W.3d 308, 311 n. 4 (Mo.App.2003). To qualify as a tacit admission, three requirements must be met: "(1) the statement must be made in the presence and hearing of the accused; (2) the statement must be sufficiently direct, as naturally would call for a reply; and (3) the statement must not have been made at a judicial proceeding, or while the accused was in custody or under arrest." *State v. Samuel*, 521 S.W.2d 374, 375 (Mo. banc 1975) (internal citations omitted). All of the statements made by Greathouse meet these requirements. First, Greathouse's comments were made in the presence and hearing of Coday. Second, these comments were sufficiently direct and incriminating as to naturally call for a reply by Coday if they were untrue. Third, Great-

house and Coday were speaking to each other at a party and did not realize their conversation was being overheard. Therefore, everything said by Coday, or by Greathouse in Coday's presence, was admissible against Coday as the direct or tacit admission of a party-opponent. Introducing evidence of an admission by a party-opponent presents neither hearsay nor Confrontation Clause issues because the party against whom it is offered does not need an opportunity to cross-examine himself. *See Stratton v. City of Kansas City*, 337 S.W.2d 927, 931 (Mo.1960); *Brown*, 833 S.W.2d at 438–39; *see also United States v. Kehoe*, 310 F.3d 579, 591 (8th Cir.2002).

▮▮▮▮ Alternatively, Greathouse's comments were admissible against Coday as the statements of a co-conspirator. Statements of one conspirator are admissible against another under the co-conspirator exception to the hearsay rule, even when the conspirators are not charged with conspiracy. *State v. Pizzella*, 723 S.W.2d 384, 388 (Mo. banc 1987); *State v. Leisure*, 838 S.W.2d 49, 56 (Mo.App.1992). Coday argues that this hearsay exception does not apply because Victim's murder had already been committed when the conversation between Greathouse and Coday occurred. If a conspiracy continues for any purpose, however, statements made after the commission of the crime are still admissible pursuant to this exception to the hearsay rule. *State v. Ferguson*, 20 S.W.3d 485, 496–97 (Mo. banc 2000); *State v. Clevenger*, 733 S.W.2d 782, 784 (Mo.App. 1987). Here, the comments about which William Moore testified took place during a conversation between Coday and Greathouse concerning their desire to commit the same type of crime again. This conversation took place at a point in time

tion of the Sixth Amendment's Confrontation Clause. *Id.* at 61, 124 S.Ct. 1354.

when neither man had yet been suspected of Victim's rape, sodomy and murder. Their review of the specific details of the crime, particularly concerning how to better hide a body so as to make its discovery more difficult, can reasonably be interpreted as a continuing conspiracy to kidnap, sexually assault and kill another teenage girl. As such, Greathouse's comments were admissible as the statements of a co-conspirator engaged in a continuing conspiracy with Coday.

Assuming *arguendo* that Greathouse's comments were inadmissible hearsay, the motion court's decision to grant Coday a new trial is still clearly erroneous. The court's decision was based on the premise that the admission of this evidence prejudiced Coday because it constituted the only specific evidence at trial that he "dealt a death blow" to Victim. This premise is false. One of the State's other witnesses, Leslie Holloway, testified that Coday admitted he was the one who hit Victim in the head with a rock. The medical examiner testified that this blow was the one that killed Victim. Therefore, William Moore's testimony on this issue was cumulative. Trial counsel's failure to object to cumulative evidence is not prejudicial. *See Moss v. State*, 10 S.W.3d 508, 512 (Mo. banc 2000).

After reviewing the entire record, this Court is left with the definite and firm impression that a mistake has been made. The motion court clearly erred in granting Coday a new trial on the ground that his counsel was ineffective for failing to object to William Moore's testimony concerning Greathouse's statements. The State's third point is granted.

### B. Coday's Cross–Appeal

In Coday's cross-appeal, he contends the motion court clearly erred in failing to grant relief on four other grounds contained in the amended motion. After reviewing the entire record, we are not left with the firm belief that the motion court made any mistakes in disposing of Coday's additional allegations of ineffective assistance by counsel.

In Coday's first point, he argues the motion court clearly erred in denying post-conviction relief because the State failed to disclose the full nature of the deal it had reached with Billy Liles. Specifically, Coday claims the jury did not know Billy could receive probation, so counsel was not able to fully impeach Billy's testimony. The motion court found that Billy did disclose at trial that there was a possibility he could receive probation. That finding is supported by the evidence. During the State's opening statement, the prosecuting attorney stated:

> The State is going to call an individual by the name of Billy Liles. Billy Liles is a cooperating State witness. He was present at the time of the crime. Billy Liles is going to tell you that he pled guilty to Sexual Assault and is awaiting sentencing. He will tell you that he's agreed to testify truthfully and completely for the State and, as a result of that, he was charged with Sexual Assault, which is a Class C felony carrying a punishment of one to seven years in the penitentiary. Liles will also say that the State is going to make a favorable— could make a favorable recommendation at his sentencing, which could be from one to seven years in the pen, it could be felony probation.

During Billy's testimony, he told the jury that: (1) he had pled guilty to sexual assault; (2) he had not yet been sentenced; and (3) the range of sentence was "[f]rom one year to seven years or it could be a suspended sentence with five years probation." At sentencing, Billy received a seven-year sentence. Execution of the sen-

tence was suspended, and he was placed on five years probation. We find no merit in Coday's assertion that the jury did not know Billy could receive probation pursuant to his plea agreement with the State. Coday's first point is denied.

■ In Coday's second point, he argues the motion court erred in denying post-conviction relief because counsel failed to question Leonard Liles and Billy Liles about Billy's statement that "they had the wrong guy" for Victim's murder. Coday claims he was prejudiced because this was an exculpatory statement showing he was not guilty of the murder. The following additional facts are relevant to this argument.

In 1995, Greathouse and Coday had been charged, via separate indictments, with Victim's murder. Both were in jail and awaiting trial. Leonard Liles was Billy's brother. In the summer of 1995, Leonard heard Billy say that "the guy that they arrested, he's not the right one." Billy was referring to Victim's murder, but he would not tell Leonard the name of the person Billy thought had been wrongly arrested. At the post-conviction hearing, Coday introduced testimony from Billy that he had been referring to Coday because "at that time I believed that he didn't kill [Victim] .... that Mr. Great-house did." The reference to Coday being the "wrong guy" was based on Billy's opinion that "Coday was not implicated in the killing as far as actually doing the killing. . . ." The motion court denied relief, in part, because the foregoing statements might not be admissible. This conclusion is not clearly erroneous.

■ As a general rule, opinion testimony from a lay person is inadmissible when the trier of fact is as capable as the witness to draw conclusions from the facts provided. *Shockley v. State,* 147 S.W.3d 189, 194 (Mo.App.2004); *State v. Gardner,*

955 S.W.2d 819, 823 (Mo.App.1997). Similarly, a lay person may not give an opinion when "it has the effect of answering the ultimate issue the jury is to determine." *State v. Cason,* 596 S.W.2d 436, 440 (Mo. 1980). Since Billy remained inside the van at all times when Greathouse and/or Coday were outside with Victim, he never actually witnessed any of the critical events surrounding Victim's murder. In particular, Billy did not see who actually inflicted the head wound that caused Victim's death. Accordingly, Billy's statement to his brother about Coday being the "wrong guy" was based on nothing more than Billy's speculation or supposition that Greathouse was the actual killer. As such, neither Leonard Liles' nor Billy Liles' testimony concerning this opinion was admissible. *See State v. Boyd,* 706 S.W.2d 461, 465 (Mo. App.1986) (the trial court erred in permitting a witness to testify that defendant stabbed the victim because witness did not see defendant do so; the witness' testimony was an inadmissible conclusion he drew from other observations). Coday's second point is denied.

■ In Coday's third point, he contends the motion court erred in denying post-conviction relief because counsel failed to call Clifford Landsdown as a witness to testify that Lee Liles did not work steadily for him. Coday argues this testimony would have contradicted Leslie Holloway's testimony that Coday was stalking her. The following additional facts are relevant to this argument.

The admissions made by Coday to Holloway have already been summarized above. Holloway testified that she did not report this information to police until 1994 because she was afraid of Coday. Holloway testified that Coday threatened to kill her and "he stalked me for—like three weeks." At that point in time, Holloway lived with Lee Liles, who worked for

Landsdown. Holloway testified that after Lee went to work, Coday would sit at a park to observe her and follow her around. During the evidentiary hearing on Coday's post-conviction motion, Landsdown testified that in 1990 and 1991, Lee only worked for Landsdown one or two days a week. Landsdown was testifying from memory about events that occurred 13–14 years earlier, and he had no records to corroborate his testimony. The motion court found that Landsdown's testimony was vague and unhelpful to the defense since there were no documents to confirm his recollection. Based on Landsdown's demeanor and the lack of documentation, the court found that Landsdown's testimony should be given little weight and, even if believed, would not have undermined Holloway's testimony.

■ A reviewing court defers to the motion court's superior opportunity to judge the credibility of the witnesses. *State v. Simmons*, 955 S.W.2d 752, 773 (Mo. banc 1997); *Payne v. State*, 21 S.W.3d 843, 845 (Mo.App.1999). Based on our review of the record, the motion court's finding concerning the weight and value of Landsdown's testimony is not clearly erroneous. Since there is no reasonable probability that the outcome of Coday's trial would have been different if trial counsel had called Landsdown as a witness, Coday suffered no prejudice from counsel's failure to do so. *See Winder v. State*, 151 S.W.3d 413, 418 (Mo.App.2004). Coday's third point is denied.

■ In Coday's fourth point, he contends the motion court erred in denying post-conviction relief because counsel failed to request a judgment of acquittal at the close of the State's opening statement. Coday claims the opening statement was deficient because it did not include any facts establishing deliberation by Coday.

The following additional facts are relevant to this argument.

In opening statement, the prosecuting attorney informed Coday that he was charged with first degree murder. He asserted that Coday "knowingly, alone or in concert with another, caused the death of [Victim] after deliberation." The prosecuting attorney then outlined evidence that tended to prove the following facts: Coday was with Victim the night she died. Coday, Greathouse and Billy Liles picked Victim up while she was walking alone on a gravel road. She was killed by being struck in the head by a rock. Coday admitted his involvement in the murder to Dickie Moore and Leslie Holloway. Coday said he would do it again if he could. Coday was observed returning to the scene of the murder in his dump truck. Once there, he used the dump truck to obliterate the tire tracks left by his van.

■ In a criminal case, the State was required to make an opening statement. Rule 27.02(f); § 546.070(1). It is not the purpose of the State's opening statement to test the competency or sufficiency of the State's evidence. *State v. Bauers*, 702 S.W.2d 896, 899 (Mo.App. 1985); *State v. Hurst*, 612 S.W.2d 846, 853 (Mo.App.1981). Instead, "[i]ts purpose is to advise the jury of the facts the state intends to prove and to inform the defendant of the planned course of prosecution in order to fairly enable the defendant to defend against the charges brought against him." *Bauers*, 702 S.W.2d at 899. Therefore, an opening statement is deemed sufficient when the facts stated therein, together with the reasonable inferences drawn therefrom, apprise the defendant of the charges against him. *See State v. Barber*, 587 S.W.2d 325, 328 (Mo. App.1979). "A trial court should direct a verdict against the State in a criminal prosecution on the opening statement of

prosecuting counsel *only* when it clearly and affirmatively appears from the statement that the charge against the accused cannot be sustained under any view of the evidence and *only* when the opportunity to correct or embellish the statement has been given to the prosecutor subsequent to the accused's motion for a directed verdict." *State v. Johns,* 34 S.W.3d 93, 110 (Mo. banc 2000) (italics in original).

■ Here, the motion court found that the State's opening statement was sufficient. The conclusion is not clearly erroneous. There are three required elements of proof for the crime of first degree murder: (1) knowingly; (2) causes the death of another person; (3) after deliberation. § 565.020; *State v. O'Brien,* 857 S.W.2d 212, 217 (Mo. banc 1993). Deliberation is defined as "cool reflection for any length of time no matter how brief." § 565.002(3). "Direct proof of a required mental state is seldom available, and the mental state may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying." *Johns,* 34 S.W.3d at 110.

In the State's opening statement, it asserted that Coday, acting alone or in concert with another, knowingly killed Victim after deliberation. To prove Coday committed first degree murder by acting alone, the State had to present evidence that Coday knowingly caused Victim's death after deliberation. To prove that Coday committed first degree murder by acting in concert with another, the State had to present evidence that: (1) Coday committed acts which aided the other in killing Victim; (2) it was Coday's conscious purpose in committing these acts that Victim be killed; and (3) Coday committed these acts after coolly deliberating on Victim's death for some amount of time, no matter how short. *See O'Brien,* 857 S.W.2d at 218. The facts presented in the State's opening statement were sufficient to apprise Coday of the charges against him, to lay out the State's evidence concerning his involvement as a principal or an accomplice to Victim's murder and to permit the inference that he deliberated prior to Victim's death. *See Johns,* 34 S.W.3d at 110.

Even if the State's opening statement was deficient, however, we can discern no prejudice to Coday. It would not have been proper for the trial judge to grant the motion for acquittal before giving the State an opportunity to correct or embellish its opening statement. *State v. Gray,* 423 S.W.2d 776, 786 (Mo.1968). The State's trial evidence included testimony from several witnesses who heard Coday admit that he was the person who struck the fatal blow that caused Victim's death. The circumstances under which that blow was struck would support an inference that Coday deliberated before killing Victim. Therefore, if Coday's counsel had made a motion for judgment of acquittal, it would have been futile because the State would have been able to supplement its opening statement with additional evidence tending to prove that Coday, *acting alone,* knowingly caused Victim's death after deliberation. Coday's final point is denied.

The motion court's order vacating Coday's convictions and granting him a new trial is reversed. The case is remanded with directions to the motion court to enter an order denying Coday's Rule 29.15 motion.

PARRISH, P.J., and BARNEY, J., concur.